# DISTRICT OF COLUMBIA *v.* JOHN R. THOMPSON CO., INC.

No. 617.   Argued April 30, May 1, 1953.—Decided June 8, 1953.

*Chester H. Gray* argued the cause for petitioner. With him on the brief were *Vernon E. West* and *Edward A. Beard.*

By special leave of Court, *Philip Elman* argued the cause for the United States, as *amicus curiae,* urging reversal. With him on the brief were *Attorney General Brownell* and *Acting Solicitor General Stern.*

*Ringgold Hart* argued the cause for respondent. With him on the brief were *John J. Wilson* and *Jo V. Morgan, Jr.*

By special leave of Court, *Edward F. Colladay* argued the cause for the Washington Board of Trade, as *amicus curiae,* in support of respondent. With him on the brief was *D. C. Colladay.*

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

This is a criminal proceeding prosecuted by information against respondent for refusal to serve certain members of the Negro race at one of its restaurants in the District of Columbia solely on account of the race and color of those persons. The information is in four counts, the first charging a violation of the Act of the Legislative Assembly of the District of Columbia,[1] June 20, 1872,

---

[1] Section 3 of this Act provides as follows:

"That any restaurant keeper or proprietor, any hotel keeper or proprietor, proprietors or keepers of ice-cream saloons or places where soda-water is kept for sale, or keepers of barber shops and bathing houses, refusing to sell or wait upon any respectable well-behaved person, without regard to race, color, or previous condition of servitude, or any restaurant, hotel, ice-cream saloon or soda fountain, barber shop or bathing-house keepers, or proprietors, who refuse under any pretext to serve any well-behaved, respectable person, in the same room, and at the same prices as other well-behaved and respectable persons are served, shall be deemed guilty of a misdemeanor, and upon conviction in a court having jurisdiction, shall be

and the others charging violations of the Act of the Legislative Assembly of the District of Columbia,[2] June 26, 1873, Dist. Col. Laws 1871–1873, pp. 65, 116. Each Act makes it a crime to discriminate against a person on account of race or color or to refuse service to him on that ground.

The Municipal Court quashed the information on the ground that the 1872 and 1873 Acts had been repealed by implication on the enactment by Congress of the Organic Act of June 11, 1878, 20 Stat. 102. On appeal the Municipal Court of Appeals held that the 1872 and 1873 Acts were valid when enacted, that the former Act, insofar as it applies to restaurants, had been repealed, but that the latter Act was still in effect. It therefore

---

fined one hundred dollars, and shall forfeit his or her license as keeper or owner of a restaurant, hotel, ice-cream saloon, or soda fountain, as the case may be, and it shall not be lawful for the Register or any officer of the District of Columbia to issue a license to any person or persons, or to their agent or agents, who shall have forfeited their license under the provisions of this act, until a period of one year shall have elapsed after such forfeiture."

[2] Sections 1 and 2 of the 1873 Act provide for the posting of a schedule of prices by restaurants and other eating or drinking establishments and for the filing of those schedules with the Register of the District. Section 3 provides in part:

"That the proprietor or proprietors, keeper or keepers, of any licensed restaurant, eating-house, bar-room, sample-room, ice-cream saloon, or soda-fountain room shall sell *at* and for *the* usual *or* common prices charged by him, her, or them, as contained in said printed cards or papers, any article or thing kept for sale by him, her, or them to any well-behaved and respectable person or persons who may desire the same, or any part or parts thereof, and serve the same to such person or persons in the same room or rooms in which any other well-behaved person or persons may be served or allowed to eat or drink in said place or establishment." (Italics supplied.)

Section 4 of the Act provides for a fine of $100 and the forfeiture of the license and a prohibition against its reissuance for a period of one year after the forfeiture.

affirmed the Municipal Court insofar as it dismissed the count based on the 1872 Act and reversed the Municipal Court on the other counts. 81 A. 2d 249. On cross-appeal, the Court of Appeals held that the 1872 and 1873 Acts were unenforceable and that the entire information should be dismissed. 92 U. S. App. D. C. 34, 203 F. 2d 579. The case is here on certiorari. 345 U. S. 921.

## I.

The history of congressional legislation dealing with the District of Columbia begins with the Act of July 16, 1790, 1 Stat. 130, by which the District was established as the permanent seat of the Government of the United States. We need not review for the purposes of this case the variety of congressional enactments pertaining to the management of the affairs of the District between that date and 1871. It is with the Organic Act of February 21, 1871, 16 Stat. 419, that we are particularly concerned.

That Act created a government by the name of the District of Columbia, constituted it "a body corporate for municipal purposes" with all of the powers of a municipal corporation "not inconsistent with the Constitution and laws of the United States and the provisions of this act," and gave it jurisdiction over all the territory within the limits of the District. § 1. The Act vested "legislative power and authority" in a Legislative Assembly consisting of a Council and a House of Delegates, members of the Council to be appointed by the President with the advice and consent of the Senate and members of the House of Delegates to be elected by male citizens residing in the District. §§ 5, 7. The Act provided, with exceptions not material here,[3] that "the legislative power of the District

---

[3] The limitations imposed on the States by Art. I, § 10 of the Constitution were made applicable to the District. § 18. The Legislative Assembly was denied the power to pass designated "special

shall extend to all rightful subjects of legislation within said District, consistent with the Constitution of the United States and the provisions of this act." § 18. All acts of the Legislative Assembly were made subject at all times "to repeal or modification" by Congress. § 18. And it was provided that nothing in the Act should be construed to deprive Congress of "the power of legislation" over the District "in as ample manner as if this law had not been enacted." § 18. Executive power was vested in a governor appointed by the President by and with the advice of the Senate. § 2. And it was provided that the District should have in the House of Representatives an elected delegate having the same rights and privileges as those of delegates from federal territories. § 34.

This government (which was short-lived[4]) was characterized by the Court as a "territorial government." *Eckloff* v. *District of Columbia*, 135 U. S. 240, 241. The analogy is an apt one. The grant to the Legislative Assembly by § 18 of legislative power which extends "to all rightful subjects of legislation" is substantially identical with the grant of legislative power to territorial governments which reads: "The legislative power of every Territory shall extend to all rightful subjects of legislation not inconsistent with the Constitution and laws of the United States." R. S. § 1851.

The power of Congress over the District and its power over the Territories are phrased in very similar language

---

laws" including the granting of divorces, the remission of fines, penalties, or forfeitures, changing the law of descent, creating any bank of circulation, or authorizing the issuance of notes for circulation as money or currency. § 17.

[4] The Temporary Organic Act of June 20, 1874, 18 Stat. 116, substituted a temporary government of three Commissioners appointed by the President. This form of government was placed on a permanent basis by the Organic Act of June 11, 1878, 20 Stat. 102.

An account of the "territorial government" is contained in Proctor, Washington Past and Present—A History (1930), vol. 1, pp. 130–141.

in the Constitution. Article I, § 8, cl. 17 of the Constitution provides that "The Congress shall have Power . . . To exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of the Government of the United States." Article IV, § 3, cl. 2 of the Constitution grants Congress authority over territories in the following words:

> "The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States . . . ."

The power of Congress to delegate legislative power to a territory is well settled. *Simms* v. *Simms,* 175 U. S. 162, 168; *Binns* v. *United States,* 194 U. S. 486, 491; *Christianson* v. *King County,* 239 U. S. 356, 365. The power which Congress constitutionally may delegate to a territory (subject of course to "the right of Congress to revise, alter, and revoke," *Hornbuckle* v. *Toombs,* 18 Wall. 648, 655) covers all matters "which, within the limits of a State, are regulated by the laws of the State only." [5] *Simms* v. *Simms, supra,* p. 168.

The power of Congress to grant self-government to the District of Columbia under Art. I, § 8, cl. 17 of the Con-

---

[5] This Court has sustained the validity of territorial statutes dealing with a variety of subjects: *Clinton* v. *Englebrecht,* 13 Wall. 434 (regulation of the methods of obtaining jury panels); *Snow* v. *United States,* 18 Wall. 317 (provision for an attorney general, elected by the territorial legislature, to represent the territory and to prosecute crimes against its laws); *Hornbuckle* v. *Toombs,* 18 Wall. 648 (regulation of civil procedure in the courts); *Maynard* v. *Hill,* 125 U. S. 190 (statute granting divorce); *Cope* v. *Cope,* 137 U. S. 682 (regulation of intestate succession of property); *Atchison, T. & S. F. R. Co.* v. *Sowers,* 213 U. S. 55 (limitation on the right to sue for personal injuries); *Christianson* v. *King County,* 239 U. S. 356 (provision for escheat).

stitution would seem to be as great as its authority to do so in the case of territories. But a majority of the judges of the Court of Appeals held that Congress had the constitutional authority to delegate "municipal" but not "general" legislative powers and that the Acts of 1872 and 1873, being in the nature of civil rights legislation, fell in the latter group and were for Congress alone to enact. In reaching that conclusion the Court of Appeals relied upon two decisions of the Court, *Stoutenburgh* v. *Hennick*, 129 U. S. 141, and *Metropolitan R. Co.* v. *District of Columbia*, 132 U. S. 1. The first of these cases involved an act of the Legislative Assembly of the District imposing a license tax on businesses within the District. The Court held, following *Robbins* v. *Shelby County*, 120 U. S. 489, that it could not be constitutionally applied to a representative of a Maryland company soliciting orders in the District of Columbia. The result would have been the same, as the *Robbins* case indicates, had a state rather than the District enacted such a law. So, while it is true that the Court spoke of the authority of Congress to delegate to the District the power to prescribe "local regulation" but not "general legislation," those words in the setting of the case suggest no more than the difference between local matters on the one hand and national matters, such as interstate commerce, on the other.

The second of these cases, *Metropolitan R. Co.* v. *District of Columbia*, 132 U. S. 1, presented the question of the capacity of the District of Columbia to sue. The Court held that it might do so, noting that while the District was "a separate political community," its sovereign power was lodged in the Congress. "The subordinate legislative powers of a municipal character which have been or may be lodged in the city corporations, or in the District corporation, do not make those bodies sovereign. Crimes committed in the Dis-

trict are not crimes against the District, but against the United States. Therefore, whilst the District may, in a sense, be called a State, it is such in a very qualified sense." P. 9. But there is no suggestion in that case that Congress lacks the authority under the Constitution to delegate the powers of home rule to the District.

The power of Congress over the District of Columbia relates not only to "national power" but to "all the powers of legislation which may be exercised by a state in dealing with its affairs." *Atlantic Cleaners & Dyers* v. *United States,* 286 U. S. 427, 435. And see *Stoutenburgh* v. *Hennick, supra,* p. 147. There is no reason why a state, if it so chooses, may not fashion its basic law so as to grant home rule or self-government to its municipal corporations. The Court in *Barnes* v. *District of Columbia,* 91 U. S. 540, 544, in construing the Organic Act of February 21, 1871, the one with which we are presently concerned, stated:

> "A municipal corporation, in the exercise of all of its duties, including those most strictly local or internal, is but a department of the State. The legislature may give it all the powers such a being is capable of receiving, making it a miniature State within its locality."

This is the theory which underlies the constitutional provisions of some states allowing cities to have home rule.[6] So it is that decision after decision has held that

---

[6] See Ariz. Const., Art. XIII, § 2; Calif. Const., Art. XI, § 11; Colo. Const., Art. XX, § 6; Mich. Const., Art. VIII, § 21; Minn. Const., Art. IV, § 36; Mo. Const., Art. VI, § 19; Neb. Const., Art. XI, §§ 2–4; New York Const., Art. IX, § 12; Ohio Const., Art. XVIII, § 3; Okla. Const., Art. XVIII, § 3 (a); Ore. Const., Art. XI, § 2; Tex. Const., Art. XI, § 5; Wash. Const., Art. XI, § 10; W. Va. Const., Art. VI, § 39 (a); Wis. Const., Art. XI, § 3. And see Fordham and Asher, Home Rule Powers in Theory and Practice, 9 Ohio St. L. J. 18; McGoldrick, The Law and Practice of Municipal Home Rule (1933).

the delegated power of municipalities is as broad as the police power of the state, except as that power may be restricted by terms of the grant or by the state constitution. See McQuillin, The Law of Municipal Corporations (3d ed. 1949), § 16.02 *et seq.* And certainly so far as the Federal Constitution is concerned there is no doubt that legislation which prohibits discrimination on the basis of race in the use of facilities serving a public function is within the police power of the states. See *Railway Mail Assn.* v. *Corsi,* 326 U. S. 88, 93–94; *Bob-Lo Excursion Co.* v. *Michigan,* 333 U. S. 28, 34. It would seem then that on the analogy of the delegation of powers of self-government and home rule both to municipalities and to territories there is no constitutional barrier to the delegation by Congress to the District of Columbia of full legislative power, subject of course to constitutional limitations to which all lawmaking is subservient and subject also to the power of Congress at any time to revise, alter, or revoke the authority granted..

There is, however, a suggestion that the power of Congress "To exercise exclusive Legislation" granted by Art. I, § 8, cl. 17 of the Constitution is nondelegable because it is "exclusive." But it is clear from the history of the provision that the word "exclusive" was employed to eliminate any possibility that the legislative power of Congress over the District was to be concurrent with that of the ceding states. See The Federalist, No. 43; 3 Elliot's Debates (2d ed. 1876), pp. 432–433; 2 Story, Commentaries on the Constitution of the United States (4th ed. 1873), § 1218. Madison summed up the need for an "exclusive" power in the Congress as follows:

> "Let me remark, if not already remarked, that there must be a cession, by particular states, of the district to Congress, and that the states may settle the terms of the cession. The states may make what stipulation they please in it, and, if they apprehend any

danger, they may refuse it altogether. How could the general government be guarded from the undue influence of particular states, or from insults, without such exclusive power?" Elliot's *op. cit., supra,* p. 433.

We conclude that the Congress had the authority under Art. I, § 8, cl. 17 of the Constitution to delegate its lawmaking authority to the Legislative Assembly of the municipal corporation which was created by the Organic Act of 1871 and that the "rightful subjects of legislation" within the meaning of § 18 of that Act was as broad as the police power of a state so as to include a law prohibiting discriminations against Negroes by the owners and managers of restaurants in the District of Columbia.

## II.

The Acts of 1872 and 1873 survived, we think, all subsequent changes in the government of the District of Columbia and remain today a part of the governing body of laws applicable to the District. The Legislative Assembly was abolished by the Act of June 20, 1874, 18 Stat. 116. That Act provided that the District should be governed by a Commission. § 2. The Revised Statutes relating to the District of Columbia, approved June 20, 1874,[7] kept in full force the prior laws and ordinances "not inconsistent with this chapter, and except as modified or repealed by Congress or the legislative assembly of the District." § 91. Those Acts were followed by the present Organic Act of the District of Columbia approved June 11, 1878, 20 Stat. 102, which provides that "all laws now in force relating to the District of Columbia not

---

[7] Although the compilation of these statutes carries the notation "Approved June 22, 1874," it appears that the President actually approved the bill on June 20, 1874. See House Journal, 43d Congress, First Sess., pp. 1286–1287.

inconsistent with the provisions of this act shall remain in full force and effect." § 1. We find nothing in the 1874 Act nor in the 1878 Act inconsistent with the Acts here in question. And we find no other intervening act which would effect a repeal of them. Nor is there any suggestion in the briefs or oral argument that the Acts of 1872 and 1873, presently litigated, did not survive the Acts of 1874 and 1878. It indeed appears the Acts of 1874 and 1878 precluded the repeal of these anti-discrimination laws except by an Act of Congress. As *Metropolitan R. Co.* v. *District of Columbia, supra,* at p. 7, says, the "legislative powers" of the District ceased with the Organic Act and thereafter municipal government was confined "to mere administration."

The Commissioners by the Joint Resolution of February 26, 1892, 27 Stat. 394, were vested with local legislative power as respects "reasonable and usual police regulations."[8] But there is no suggestion that their power to make local ordinances was ever exercised to supplant these anti-discrimination laws of the Legislative Assembly with new and different ordinances. Rather the argument is that the 1872 and 1873 Acts were repealed by the Code of 1901, 31 Stat. 1189. Section 1636 of that Code provides in part:

> "All acts and parts of acts of the general assembly of the State of Maryland general and permanent in their nature, all like acts and parts of acts of the legislative assembly of the District of Columbia, and

[8] Section 2 of that Act authorized the Commissioners "to make and enforce all such reasonable and usual police regulations . . . as they may deem necessary for the protection of lives, limbs, health, comfort and quiet of all persons and the protection of all property within the District of Columbia."

The earlier Act of January 26, 1887, 24 Stat. 368, had given the Commissioners authority to make and enforce "usual and reasonable police regulations" over specified matters.

all like acts and parts of acts of Congress applying solely to the District of Columbia in force in said District on the day of the passage of this act are hereby repealed, except:

"Third. Acts and parts of acts relating to the organization of the District government, or to its obligations, or the powers or duties of the Commissioners of the District of Columbia, or their subordinates or employees, or to police regulations, and generally all acts and parts of acts relating to municipal affairs only, including those regulating the charges of public-service corporations. . . ."

The Court of Appeals held that these anti-discrimination laws were "general and permanent" legislation within the meaning of § 1636 and repealed by it, not being saved by the exceptions. The Department of Justice presents an elaborate argument, based on the legislative history of the 1901 Code, to the effect that the anti-discrimination laws here involved were not "general and permanent" laws within the meaning of § 1636. But the lines of analysis presented are quite shadowy; and we find it difficult not to agree that the 1872 and 1873 Acts were "general and permanent" as contrasted to statutes which are private, special, or temporary. That is the sense in which we believe the words "general and permanent" were used in the Code. We conclude, however, that they were saved from repeal by the *Third* exception clause quoted above.

It is our view that these anti-discrimination laws governing restaurants in the District are "police regulations" and acts "relating to municipal affairs" within the meaning of the *Third* exception in § 1636. The Court of Appeals in *United States* v. *Cella,* 37 App. D. C. 433, 435, in construing an Act providing that prosecutions for

violations of penal statutes "in the nature of police or municipal regulations" should be in the name of the District, said,

"A municipal ordinance or police regulation is peculiarly applicable to the inhabitants of a particular place; in other words, it is local in character."

The laws which require equal service to all who eat in restaurants in the District are as local in character as laws regulating public health, schools, streets, and parks. In *Johnson* v. *District of Columbia,* 30 App. D. C. 520, the Court of Appeals held that an Act of the Legislative Assembly prohibiting cruelty to animals was a police regulation saved from repeal by the *Third* exception to § 1636. The court said it was legislation "in the interest of peace and order" and conducive "to the morals and general welfare of the community." P. 522. Regulation of public eating and drinking establishments in the District has been delegated by Congress to the municipal government from the very beginning.[9] In terms of the history of the District of Columbia there is indeed no subject of legislation more firmly identified with local affairs than the regulation of restaurants.

There remains for consideration only whether the Acts of 1872 and 1873 were abandoned or repealed as a result of non-use and administrative practice. There was one view in the Court of Appeals that these laws are presently unenforceable for that reason. We do not agree. The failure of the executive branch to enforce a law does

---

[9] See Act of May 3, 1802, 2 Stat. 195, 197 (empowering the City of Washington to provide for the licensing and regulation of "retailers of liquors"); the Act of February 24, 1804, 2 Stat. 254, 255 (authorizing the council of the City of Washington "to license and regulate, exclusively, hackney coaches, *ordinary keepers,* retailers and ferries"); the Act of May 15, 1820, 3 Stat. 583, 587 (authorizing the council of the City of Washington to provide "for licensing, taxing, and regulating, auctions, retailers, ordinaries"). (Italics supplied.)

not result in its modification or repeal.  See *Louisville &
N. R. Co.* v. *United States,* 282 U. S. 740, 759; *United
States* v. *Morton Salt Co.,* 338 U. S. 632, 647, 648.  The
repeal of laws is as much a legislative function as their
enactment.[10]

Congress has had the power to repeal the 1872 and 1873
Acts from the dates of their passage by the Legislative
Assembly.  But as we have seen, it has not done so.

Congress also has had the authority to delegate to a
municipal government for the District the power to pass
laws which would alter or repeal the Acts of the Legisla-
tive Assembly.  As we have seen, the Organic Act of the
District of Columbia approved June 11, 1878, withdrew
legislative powers from the municipal government.  In
1892 the Commissioners were given legislative power as
respects "reasonable and usual police regulations." [11]
That legislative authority could have been employed to
repeal the Acts of 1872 and 1873.  See *Stevens* v. *Stout-
enburgh,* 8 App. D. C. 513.  For as we have noted, regu-
lation of restaurants is a matter plainly within the scope
of police regulations.  But the Commissioners passed no
ordinances dealing with the rights of Negroes in the res-
taurants of the District.  It is argued that their power to
do so was withdrawn by Congress in the Code of 1901.  It
is pointed out that the Code of 1901 kept in force the acts,

---

[10] See *Snowden* v. *Snowden,* 1 Bland (Md.) 550, 556; *Pearson* v.
*International Distillery,* 72 Iowa 348, 357, 34 N. W. 1, 5–6.

We are not concerned here with the type of problem presented
by *Federal Trade Commission* v. *Bunte Bros.,* 312 U. S. 349, 352,
where want of assertion of power was deemed significant in deter-
mining whether the power had actually been conferred.  In the
present case the fact that there have been no attempts over the
years to enforce the 1872 and 1873 Acts is irrelevant to the problem
of statutory construction, since there is no doubt that those Acts
made unlawful the refusal to serve a person in a restaurant in the
District of Columbia because he was a Negro.

[11] See note 8, *supra.*

ordinances, and regulations not repealed; [12] and from that the conclusion is drawn that only Congress could thereafter amend or repeal these enactments of the Legislative Assembly.

We find it unnecessary to resolve that question. For even if we assume that after the Code of 1901 the Commissioners had the authority to replace these anti-discrimination laws with other ones, we find no indication that they ever did so. Certainly no ordinance was enacted which purported to repeal or modify those laws or which, by providing a different measure of a restaurant owner's duty, established a standard in conflict with that provided by the Legislative Assembly.

But it is said that the licensing authority of the Commissioners over restaurants has been employed for 75 years without regard to the equal service requirements of the 1872 and 1873 Acts, that no licenses have been forfeited for violations of those Acts, and that the licensing authority of the Commissioners has been employed in effect to repeal or set aside the provisions of those Acts. But those regulations are health, safety, and sanitary measures.[13] They do not purport to be a complete codification of ordinances regulating restaurants. They contain neither a requirement that Negroes be segregated nor that Negroes be treated without discrimination. The

---

[12] Section 1636 provided:

"All acts and parts of acts included in the foregoing exceptions, or any of them, shall remain in force except in so far as the same are inconsistent with or are replaced by the provisions of this code."

Moreover, § 1640 provided, "Nothing in the repealing clause of this code contained shall be held to affect the operation or enforcement in the District of Columbia . . . of any municipal ordinance or regulation, except in so far as the same may be inconsistent with, or is replaced by, some provision of this code."

[13] Congress has granted to the Commissioners authority to license certain businesses, including restaurants. D. C. Code (1951) §§ 47–2301, 47–2327. The Commissioners are authorized to promulgate

case therefore appears to us no different than one where the executive department neglects or refuses to enforce a requirement long prescribed by the legislature.

It would be a more troublesome case if the 1872 and 1873 Acts were licensing laws which through the years had been modified and changed under the legislative authority of the Commissioners. But these Acts do not provide any machinery for the granting and revocation of licenses. They are *regulatory* laws prescribing in terms of civil rights the duties of restaurant owners to members of the public. Upon conviction for violating their provisions, penalties are imposed. There is a fine and in addition a forfeiture of license without right of renewal for a year. But these Acts, unlike the sanitary requirements laid upon restaurants,[14] do not prescribe conditions for the issuance of a license. Like the

---

regulations governing the issuance and revocation of such licenses. *Id.*, § 47–2345.

The Commissioners in the Police Regulations of the District of Columbia (1944) have provided various regulations of restaurants, *e. g.*, a requirement that a certificate be obtained from the health officer that the "premises are in proper sanitary condition," Art. XVII, § 19; regulation pertaining to garbage disposal, Art. XXI, §§ 2, 3; a requirement that draperies and decorations in restaurants be fireproof, Art. XVII, § 2. The Commissioners on April 1, 1942, promulgated "Regulations Governing the Establishment and Maintenance of Restaurants, Delicatessens and Catering Establishments in the District of Columbia." These regulations, as amended February 23, 1951, impose various sanitation requirements relating to the structures, fixtures, utensils, and personnel employed in restaurants. They provide for revocation of licenses for failure to comply with the regulations and impose a fine of $300 for violations.

Congress has also provided numerous health measures to regulate the sale of food. See D. C. Code (1951) § 33–101 *et seq.;* § 22–3416 *et seq.* Restaurants which sell alcoholic beverages are regulated under D. C. Code (1951) § 25–101 *et seq.*

[14] See note 13, *supra.*

regulation of wages and hours of work, the employment of minors, and the requirement that restaurants have flameproof draperies,[15] these laws merely *regulate* a licensed business. Therefore, the exercise of the *licensing* authority of the Commissioners could not modify, alter, or repeal these laws.[16] Nor can we discover any other legislative force which has removed them from the existing body of law.

Cases of hardship are put where criminal laws so long in disuse as to be no longer known to exist are enforced against innocent parties. But that condition does not bear on the continuing validity of the law; it is only an ameliorating factor in enforcement.

We have said that the Acts of 1872 and 1873 survived the intervening changes in the government of the Dis-

---

[15] See note 13, *supra.*

[16] The 1872 and 1873 Acts make mandatory the forfeiture of the license to operate a restaurant once a violation has been established. See notes 1 and 2, *supra.* More recent laws, enacted by Congress, state the terms on which licenses of various establishments including restaurants may be granted and revoked. See D. C. Code (1951) §§ 47–2301, 47–2302, 47–2327, 47–2345. Sec. 47–2345 grants the Commissioners authority to revoke a license "when, in their judgment, such is deemed desirable in the interest of public decency or the protection of lives, limbs, health, comfort, and quiet of the citizens of the District of Columbia, or for any other reason they may deem sufficient." Special provisions are also included for the licensing of persons selling alcoholic beverages and for the revocation of those licenses. D. C. Code (1951) §§ 25–111, 25–115, 25–118. Whether the provisions for forfeiture of licenses contained in the 1872 and 1873 Acts have been modified or superseded by the licensing provisions of those laws is a separate and distinct question on which we intimate no opinion. Even if it were held that the basis for revocation of a restaurant owner's license and the procedure by which that revocation is effected are governed by the later laws, it is clear that the new licensing laws leave unaffected the mandate against discrimination on racial grounds and the provision for a fine of $100 contained in the 1872 and 1873 Acts.

trict of Columbia and are presently enforceable. We would speak more accurately if we said that the 1873 Act survived. For there is a subsidiary question, which we do not reach and which will be open on remand of the cause to the Court of Appeals, whether the 1872 Act under which the first count of the information is laid was repealed by the 1873 Act. On that we express no opinion.

*Reversed.*

MR. JUSTICE JACKSON took no part in the consideration or decision of this case.