No. 46,938

Hutchinson Human Relations Commission, *Appellant*, v. Midland Credit Management, Inc., *Appellee.*

(517 P. 2d 158)

Opinion filed December 8, 1973.

*John A. Robinson,* city attorney, argued the cause and was on the brief for the appellant.

*Lane H. Cronhardt,* of Hutchinson, argued the cause and was on the brief for the appellee.

*David L. Ryan,* of Topeka, argued the cause, and *Vern Miller,* attorney general, *Charles S. Scott* and *Roger W. Lovett,* both of Topeka, were with him on the brief for Kansas Commission on Civil Rights, National Association for the Advancement of Colored People, American G. I. Forum and Kansas Human Relations Association, *amici curiae.*

*F. Duane Roberts* and *Joseph W. Zima,* both of Topeka, were on the brief for State of Kansas, ex rel. Darrell D. Carlton, State Labor Commissioner, *amicus curiae.*

The opinion of the court was delivered by

FONTRON, J.: This is an action for specific performance of a "conciliation agreement," an instrument prominently known in the field of civil rights. It is brought by the Hutchinson Human Relations Commission against Midland Credit Management, Inc. We shall refer to the parties as plaintiff or Commission, on the one hand, and defendant or Midland, on the other. During the pleading stage Midland filed a motion to dismiss, a motion for summary judgment, and an answer. The trial court granted the motion to dismiss and the Commission has appealed.

By way of background the City of Hutchinson, Kansas, first adopted a human relations ordinance in 1968. That ordinance was repealed in 1971 and the present ordinance, No. 6132, was adopted in its stead. Some time thereafter a complaint, which is not contained in the record, was lodged against Midland alleging an unfair employment practice in violation of the ordinance, and on March 3, 1972, the following agreement was entered into:

"THIS AGREEMENT is made and entered into as of the 3rd day of

March, 1972, between the HUTCHINSON HUMAN RELATIONS COMMIS-
SION, hereinafter referred to as the Commission, and MIDLAND CREDIT
MANAGEMENT, INC., hereinafter referred to as the Respondent.

"A complaint having been filed under Chapter 37, Section 37-6 of the Code
of the City of Hutchinson, Kansas, by Mrs. Bobby Van Buren against Respon-
dent, the Commission having found Probable Cause to credit the allegations
of discrimination due to Respondent's failure to hire because of race. The
matter having been conciliated, the parties hereby agree to and do settle the
above matter in the following extent and manner:

"1. Respondent agrees that it is the stated policy of his company to offer
employment and promotion in all positions to all persons regardless of race,
sex, religion, color, national origin or ancestry. Respondent further agrees to
communicate this policy, together with specific directives to assure it is carried
out, to all his employees (or to all his supervisors) by written memo and to
furnish the Commission with a copy of said memo.

"2. Respondent agrees to actively recruit and hire qualified minority people
for positions in the office staff job classifications when the next vacancy occurs
in this specific job area.

"3. (Deleted from agreement.)

"4. Respondent agrees that the Commission may, on its own motion, review
compliance with the terms of the present agreement.

"5. The Commission agrees to close this case as a Satisfactory Adjustment,
subject to the performance by the Respondent of the promises and represent-
atives (sic) contained herein.

(Signatures are omitted.)"

On May 5, 1972, the instant action was filed. In brief, the
petition alleges the making of the agreement as a result of a con-
ciliation settlement; that about April 10, 1972, Midland placed an
ad for a secretary in the Hutchinson News and on April 12 hired
a white female secretary to fill the position; that Midland breached
the agreement by failing to actively recruit and hire a minority
person for the next existing vacancy; and that the breach was willful,
wanton and without just cause. The petition concludes with a
prayer for specific performance of the contract or in lieu thereof for
$500 damages and $1000 punitive damages.

In dismissing the plaintiff's lawsuit the trial court, in a well-
prepared memorandum opinion, summarized its reasons for doing so
under four categories: (1) The ordinance exceeds the police power
granted cities. (2) The ordinance empowers the Commission to
seek specific performance only, not damages for breach of contract.
(3) The agreement is contrary to public policy in that an employer
would be forced to hire a lesser qualified black than a better
qualified white. (4) (a) Specific performance of an illegal agree-

ment is improper. (*b*) Generally, equity will not specifically enforce a contract involving a breach of duty to a third party. (*c*) An agreement made in consideration of preventing or refraining from prosecution for crime is against public policy. (*d*) To compel Midland to discharge a white employee and hire a minority person could be an unlawful employment practice.

In its statement of points the Commission asserts that the trial court erred in dismissing the action on the several grounds assigned. We shall discuss the points raised on appeal in the sequence summarized by the trial court, but before doing so, we pause to point out certain provisions of the Hutchinson ordinance deemed material. It provides for a Human Relations Commission of seven resident Hutchinson citizens who are to be appointed by the mayor with the consent of the city governing body. Among the functions, duties and responsibilities enumerated in section 37.4 of the ordinance, the Commission is given authority (1) to receive, initiate, investigate, pass upon and attempt to conciliate all complaints alleging discrimination, segregation or separation in employment, in public accommodations or in public housing because of race, religion, color, national origin or ancestry; (2) to apply to the district court, after a complaint has been filed, to enjoin violation of the ordinance; and (3) to apply to the district court for enforcement of any conciliation agreement by seeking specific performance of the agreement. The ordinance also contains a section setting out complaint procedures, and other sections defining unlawful employment, public accommodations and housing procedures.

The first point for consideration is whether the city of Hutchinson, by enacting the ordinance, has acted within—or in excess of—its police power. This point encompasses, as well, questions relating to conflict with Kansas statutes and preemption of civil rights matters by the state.

The ordinance itself declares it to be the policy of the city in the exercise of its police power for the protection of the public safety, public health and general welfare, for the maintenance of business and good government and for the promotion of the city's trade and commerce to eliminate and prevent discrimination, segregation or separation because of race, sex, religion, color, national origin or ancestry, and to assure equal opportunities and encouragement to every person in securing employment, equal public accommodations and equal housing opportunities.

We would be hard pressed to say at this point in time and history that legislation designed to eliminate the poison of discrimination from our midst is not a proper exercise of the police power. Recent experience has gone far to demonstrate, particularly in urban communities, that discrimination against minorities has a direct and detrimental impact on the orderly processes of government, the peace and tranquility of a community, and the health, safety and general well-being of its residents.

Problems arising from racial and other forms of discrimination are especially common in population centers; the cancer of injustice toward members of minority groups is peculiarly virulent on the local scene; discrimination is essentially a people problem, and must eventually be dealt with and solved by people in the localities where they live.

Although there is some authority to the contrary we believe the more rational view to be that the enactment of a civil rights ordinance is a proper exercise of a municipality's police power as tending to promote the health, safety, convenience and general welfare of its citizens. This view is reflected in *Marshall v. Kansas City*, 355 S. W. 2d 877 (Mo.), in which the plaintiff challenged the constitutionality of a Kansas City ordinance which declared it unlawful for restaurants, hotels and motels to refuse to serve or accommodate any person for any reason directly or indirectly related to race. In deciding that the ordinance was constitutional, the Missouri court said:

"We are constrained to hold that this municipal ordinance, designed to prevent discrimination by reason of race or color in restaurants, bears a substantial and reasonable relation to the specific grant of power to regulate restaurants and to the health, comfort, safety, convenience and welfare of the inhabitants of the city and is fairly referable to the police power of the municipal corporation. (Citing cases.)" (p. 883.)

In the case of *District of Columbia v. Thompson Co.*, 346 U. S. 100, 97 L. Ed. 1480, 73 S. Ct. 1007, Thompson assailed the validity of two acts of the Legislative Assembly of the District of Columbia enacted in 1872 and 1873, making it an offense to discriminate against a person on account of race or color or to refuse service to him on such grounds. In upholding each of the ordinances as a valid exercise of police power, the federal court pointed out that Congress in creating the District had constituted it a body corporate for municipal purposes and had vested legislative authority in its

Assembly extending to all rightful subjects of legislation within the district.

The court analogized the congressional grant of power to the district with that of a state to its municipalities, and went on to say:

". . . There is no reason why a state, if it so chooses, may not fashion its basic law so as to grant home rule or self-government to its municipal corporations. The Court in *Barnes v. District of Columbia*, 91 U. S. 540, 544, in construing the Organic Act of February 21, 1871, the one with which we are presently concerned, stated:

" 'A municipal corporation, in the exercise of all of its duties, including those most strictly local or internal, is but a department of the State. The legislature may give it all the powers such a being is capable of receiving, making it a miniature State within its locality.'

"This is the theory which underlies the constitutional provisions of some states allowing cities to have home rule. So it is that decision after decision has held that the delegated power of municipalities is as broad as the police power of the state, except as that power may be restricted by terms of the grant or by the state constitution. . . ." (pp. 108, 109.)

A similar view is expressed by the Kentucky court in *Commonwealth v. Beasy*, 386 S. W. 2d 444 (Ky.), in upholding an ordinance of Louisville prohibiting discrimination in places of public accommodations on account of race, color, national origin, etc. In that case the court said:

". . . In *Fowler v. Obier*, 224 Ky. 742, 7 S. W. 2d 219, it was held that the police power granted by charter to cities of the first class is as broad as the police power of the state. . . ." (p. 447.)

Kansas voters adopted the Home Rule Amendment (Article 12, § 5) at the general election held in 1960 to take effect July 1, 1961. Under the provisions of the amendment cities are empowered to determine their local affairs and government subject to the specific limitations found in the amendment. These limitations are spelled out in the recent case of *Claflin v. Walsh*, 212 Kan. 1, 7, 509 P. 2d 1130, and need not be repeated at this time.

In discussing the import of the Home Rule Amendment and its impact on the relationship between the state and its sundry municipalities this court, speaking through Mr. Justice Prager, had this to say:

"Section 5 (*d*) of Article 12 requires a liberal construction of the powers and authority granted cities for the purpose of giving to cities the largest measure of self-government. This provision simply means that the home rule power of cities is favored and should be upheld unless there is a sound reason to deny it. Where the legislature has acted in some area a city's power to act

in the same area should be upheld unless the legislature has clearly preempted the field so as to preclude city action. Unless there is actual conflict between a municipal ordinance and a statute, the city ordinance should be permitted to stand. (*Leavenworth Club Owners Assn. v. Atchison,* 208 Kan. 318, 492 P. 2d 183.)"

This assessment of the spirit and purport of the act appears to accord with the view taken by the Legislature when it enacted Chapter 90, L. 1963, repealing many statutes relating to specific powers which had previously been granted to cities of the first class. Preceding Section 1 of the Act we find the following "whereases":

"WHEREAS, It no longer is necessary for the legislature of the state to confer upon cities specific powers over their local affairs and government in that such authority is now conferred directly upon them by article 12, section 5, of the Kansas constitution; and

"WHEREAS, Many statutes which formerly granted to cities specific powers over their local affairs and government, remain in the statute book but are no longer necessary and should be repealed . . ." (Here follows the repealing section of the chapter.)

We discern no essential conflict between the Kansas Act Against Discrimination (K. S. A. 44-1001, *et seq.,* as amended) and the Hutchinson Ordinance on Human Relations. While the two relate generally to the same subject, they do not clash. The ordinance appears simply to supplement the statute rather than to counteract or be at cross purposes with it. The ordinance follows the statute in many respects but the authority possessed by the Hutchinson Commission is, in fact, more restricted and circumscribed than that reposed in the Kansas Anti-discrimination Commission.

In *Leavenworth Club Owners Assn. v. Atchison,* 208 Kan. 318, 492 P. 2d 183, we held that:

"Generally a municipal regulation which is merely additional to that imposed by state law cannot be said to create a conflict therewith." (Syl. ¶ 2.)

Generally speaking, a municipal regulation which simply adds to or complements state law may not be said to create a conflict therewith unless the statute has limited the requirements to its own prescription. (62 C. J. S., Municipal Corporations, § 143 (3), p. 293.) In *Kansas City v. Henre,* 96 Kan. 794, 153 Pac. 548, this court said:

". . . [W]here power is conferred upon cities to enact ordinances for the preservation of peace and good order within the city or for the preservation of the health of its inhabitants it may be exercised although the legislature has provided state regulations on the same subjects. . . ." (pp. 796, 797.)

We believe what the New York court said on this point in *Mtr.*

*Feigenblum v. Comm. Human Rgts.,* 53 Misc. 2d 360, 363, 364, 278 N. Y. S. 2d 652, is germane:

"The petitioners' contention that the New York City law on human rights is unconstitutional is untenable. The New York State Legislature has not indicated an intent to pre-empt the field of discrimination in housing. . . . Here the local law merely supplements the State Law. It does not prohibit that which the State law permits, nor does it allow that which the State forbids. In this case they are entirely consistent and the conclusion follows that the local law is valid (*City of New York v. Clafington, Inc.,* 40 Misc. 2d 547). Moreover the creation of the State Commission and the conferring upon it of certain powers merely affords an additional forum or avenue for possible redress of actions prohibited by constiutional or statutory law. . . ."

It is insisted by both Midland and *amicus,* State Labor Commissioner, that the legislature has preempted the field of civil rights for exclusive action by the state, at least so far as discrimination in matters of employment is concerned. We find it difficult to agree with this position. The Kansas Act Against Discrimination contains no preemptive provision whatever among its numerous sections and we view the omission of a provision of that kind as having significance. In *Blue Star Supper Club, Inc. v. City of Wichita,* 208 Kan. 731, 735, 495 P. 2d 524, we said that the omission of a preemptive provision in a statute relating to private clubs could not be viewed as unintentional, since the legislature was undoubtedly aware of the manner in which state-wide preemption may be accomplished.

An intent on the part of the legislature to retain exclusive jurisdiction to legislate in a given area must be clearly shown. Where such an intention cannot be gathered from the language of the statute itself, whatever extrinsic evidence there may be of prescriptive intent must be clear and convincing before the power to regulate can be said to have been withdrawn from our cities. (*Claflin v. Walsh,* supra; *City of Beloit v. Lamborn,* 182 Kan. 288, 321 P. 2d 177; *Bloom v. City of Worcester,* _____ Mass. _____, 293 N. E. 2d 268.)

In our judgment there is no compelling evidence of a prescriptive intent in the case before us. Our attention has been called to K. S. A. 1972 Supp. 44-1024 and 44-1110. Both statutes might, by implication, be said to suggest that the legislature did not intend to pre-empt the field of civil rights area in its entirety, although the defendant would have us draw a contrary inference therefrom.

We are also aware of Senate Bill No. 223 which is now pending before the legislature. By express pronouncement this bill would

empower cities to adopt ordinances providing for the creation of a human relations commission, subject to certain restrictions. While this piece of legislation cleared the Senate it was held over in the House, where it now languishes. We note the bill was introduced after the trial court in this case had handed down its decision declaring the ordinance invalid. From what transpired at Senate committee hearings held on the bill we may infer that a principal reason for its introduction was to eliminate the uncertainties created by the district court's judgment. In any event we do not view the pendency of the measure as clear, convincing and unambiguous evidence of a legislative intent to preempt the entire civil rights field for exclusive state action.

We turn to the second point covered in the trial court's decision: the question of damages. The Commission has prayed for specific performance of the agreement or in lieu thereof $500 actual and $1000 punitive damages. The ordinance authorizes the Commission to sue for specific performance but is silent as to recovery of damages.

The plaintiff would have us invoke the rule that where it is impossible to grant full relief by decreeing specific performance of a contract the court, in the exercise of its discretion, may award damages in lieu thereof. (*Knipe v. Troika*, 92 Kan. 549, 553, 141 Pac. 557; *Brush v. Boyer*, 104 Kan. 168, 169, 178 Pac. 445; *Owen v. Christopher*, 144 Kan. 765, 770, 62 P. 2d 860; 49 Am. Jur., Specific Performance, § 172, p. 195.)

We believe the rule is not applicable here. If a breach of contract be established by evidence adduced at the trial, we hold the opinion that adequate relief may be afforded the plaintiff by means of specific performance. The interests of both the City and the Commission lie in eradicating discrimination and insuring the peace, health and general welfare of the community, rather than in recovering money damages. We do not view the Commission as being an aggrieved person in the context of this case, or in the sense of having suffered an injury or wrong compensable in dollars. It is difficult for us to conjure up a basis for monetary damages so far as the Commission is concerned, and its counsel was unable, at oral argument, to assist us greatly in this respect.

The ordinance itself does not authorize the Commission to sue for monetary damages and we are constrained to hold that such

may not be recovered in this action. So far as punitive damages are concerned they are allowable only when actual damages may be awarded. Thus they, likewise, may not be recovered in this action. (*Shore v. Shore,* 111 Kan. 101, 205 Pac. 1027; *Behymer v. Milgram Food Stores, Inc.,* 151 Kan. 921, 101 P. 2d 912.)

We have not overlooked the several cases cited by *amici curiae,* Kansas Commission on Civil Rights, National Association for the Advancement of Colored People, American G. I. Forum and Kansas Human Relations Association, as recognizing the right of an aggrieved person to recover damages resulting from the violation of his civil rights. We have no quarrel with the underlying rationale of those cases, but the rule they espouse has no application here. In each of the cases cited by *amici* the action was brought by the individual whose civil rights had been violated to his personal prejudice and damage. The situation is quite different here. This action is maintained by the Commission on Human Rights, a governmental agency. The individual who may have been personally aggrieved by Midland's alleged failure to employ her was Ms. Van Buren according to the record. She is not a party to this lawsuit in any capacity; she is not seeking monetary damages in compensation of any loss accruing to her.

The third point to be considered is whether, as the trial court had ruled, the conciliation agreement "is against public policy as under its terms an employer would be forced to hire a lesser qualified black applicant to the detriment of both the employer and a better qualified white applicant." Closely associated with this question is the court's subsequent declaration: "To compel the defendant now to discharge his white employee and hire a member of the minority race, in essence, could be an unlawful employment practice."

With respect to the court's latter assertion, we have been given to understand that no removal of any Midland employee is sought in this action. In the *amici curiae* brief of the Kansas Commission on Civil Rights and its colleagues, it is conceded that "it may be inequitable to dismiss the secretary already hired by defendant and require Beulah Van Buren's hiring." We accept this concession at face value.

We have been advised by plaintiff on oral argument and by *amici* in their brief that the intention of the parties expressed in the second paragraph of the conciliation agreement was that defendant be required to hire a qualified black person for the next vacancy in its

office staff. We shall consider the import of the paragraph in that context.

The question presented is not easily answered, for the courts which have been called on to deal with situations somewhat analogous are not in complete accord. Although we have run across no cases squarely in point, a number of courts, both state and federal, have found it necessary in order fully to compensate victims of racial discrimination, correct past unfair labor practices or rectify existing racial imbalances, to impose hiring ratios or quotas on employers for limited periods of time and to impose similar measures on labor organizations. A few examples will serve to illustrate the pattern which we believe has developed from a majority of the reported cases.

Both sides cite *Carter v. Gallagher*, 452 F. 2d 315, 330, where the trial court directed the defendants, members of the Minneapolis Civil Service Commission and the Fire Chief, to give absolute preference in certifying twenty minority applicants for fire fighter positions who were able to qualify for such posts. The circuit court of appeals, sitting *en banc*, while acknowledging "the legitimacy of erasing the effects of past racially discriminatory practices" felt that the absolute preference ordered by the district court would operate as an infringement on the rights of nonminority group members who were equally or superiorly qualified. The appellate court did sanction, however, the certification of twenty qualified minority persons on a 1 to 3 ratio.

In *United States v. Local Union No. 212, Etc.*, 472 F. 2d 634, the defendant labor union challenged a district court ruling which required it to participate in an employment and training program. The plan was challenged because it imposed a mandatory membership quota of 11% blacks in the union and thus granted black persons a preference over whites with equal or greater qualifications. This contention was rejected by the appellate court which held that the program was not prohibited by either the Fifth or Fourteenth Amendments.

In the case of *United States v. Ironworkers Local 86*, 443 F. 2d 544, the federal district court ordered various local unions to offer job referrals to previous discriminatees, and further required the apprenticeship and training committees of the unions to select and indenture sufficient black applicants to overcome past discrimination

and meet judicially imposed requirements. In an opinion sustaining the trial court, the appellate court stated:

"The Act vests in the Attorney General and the trial court power to eliminate both the vestiges of past discrimination and terminate present discriminatory practices. . . ." (p. 553.)

Further federal rhetoric along this line will be found in *United States v. Wood, Wire & Metal Lath. Int. U., Loc. No. 46*, 471 F. 2d 408, a case in which an administrator appointed by the trial court had recommended, in order that past effects of discrimination be remedied, that work permits be issued on a one to one basis, one white to one black, for a limited period of time. In an opinion of affirmance, the appellate court said:

"However, while quotas merely to attain racial balance are forbidden, quotas to correct past discriminatory practices are not. . . ." (p. 413.)

Two state cases bear analysis. In *Iron Workers Local No. 67 v. Hart*, 191 N. W. 2d 758 (Iowa), the state civil rights commission issued an order requiring the defendant union, among other things, to admit a worker to union membership. This order was upheld.

In *Arnett v. Seattle General Hospital*, 65 Wn. 2d 22, 395 P. 2d 503, the plaintiff charged the hospital with racial discrimination in refusing to accept her application for employment in its dietary department. The Washington State Board Against Discrimination found the defeandant hospital guilty of an unfair labor practice and ordered it to accept her written application and to offer her employment in the dietary department, in the first job vacancy for which she had applied, provided she met the standard qualifications of other applicants for employment, but without regard to color, race, creed or national origin. The district court watered down the order made by the board. On appeal the district court's action was set aside on the ground that the trial judge was not authorized to substitute his judgment for that of the board and the board's order was, accordingly, reinstated. An argument was made by the hospital that the board's order violated sections of the state constituion but the appellate court declined to consider this issue since it had not been raised in the trial court.

While we recognize that the federal Civil Rights Act provides in effect that no employer shall be required to grant preferential treatment to any individual or to any group on racial or like grounds, we are of the opinion that the circumstances surrounding the present case bring it within the aura of the authorities we have just cited.

Here, the Commission found Midland had engaged in discriminatory practices and we believe the inference may safely be drawn that it had no employees on its office staff who were members of a minority race. To remedy such an imbalance resulting from past discriminatory practices, Midland agreed to actively recruit and to fill the next office vacancy with a *qualified* minority person. This would assume that such an applicant could be found through a good faith effort.

Construing the agreement within the framework contemplated by the Commission, we believe it goes no further than requiring Midland actively to recruit and hire in good faith a qualified minority person for the next occurring vacancy and to institute a policy of offering employment and promotion possibilities to all persons in the future regardless of race, sex, creed, color or national origin. We do not view this as "discrimination in reverse" offending either federal, state or municipal enactments in the area of civil rights.

In this connection, K. S. A. 1972 Supp. 44-1009 (*b*) provides that "It shall not be an unlawful employment practice to fill vacancies in such way as to eliminate or reduce imbalance with respect to race, color, sex, national origin or ancestry." The tenor of the conciliation agreement accords squarely with the provisions of this statute as well as being within the purview of the federal cases we have cited.

Two remaining reasons given by the trial court for dismissing this lawsuit should be mentioned briefly. First, the court observed that equity will not generally enforce a contract involving a breach of duty to a third party. A citation found in Williston on Contracts, 3d Ed., § 1429, is offered in support of that proposition. We believe any such rule would have little application to the present situation. This agreement is not the usual contract we run into for the benefit of a third party. Neither is the present action brought by a third-party beneficiary to enforce an agreement made for his or her benefit. Under the ordinance the Commission is empowered to negotiate conciliation agreements. This authority is exercised in the interest of the public peace and good order of the community and the safety and general welfare of the community and all its residents. We find no impediment to the enforcement of such an agreement by the Commission in the best interests of the public which it serves, and we so held.

Finally, the trial court said that "the agreement, if made in consideration of preventing or refraining from prosecution for crime would be void as against public policy." We agree the general rule is that agreements tending to obstruct, impede or interfere with the administration of justice are contrary to public policy. (17 Am. Jur. 2d, Contracts, § 193, p. 563.) However, this contract, as we see it, may not be stigmatized as containing any agreement to impede, obstruct or interfere in the administration of justice. The Commission simply agreed to close its case as being a satisfactory adjustment of the complaint, subject to performance by Midland. The Commission is not a prosecutorial agency. It possesses no power to undertake criminal prosecution. Under the terms of the ordinance the Commission, if unable to conciliate a complaint, shall notify the City Manager, but whether the complaint is to be filed in the appropriate court of law is to be determined either by the City Attorney or by the City Commission. The subject matter of this conciliation agreement does not relate to interference with proper law enforcement and the agreement is not illegal on such a basis.

We remand this case with instructions to set aside the order of dismissal and to proceed with trial of the action agreeably with the views expressed in this opinion and in accordance with established procedures. In this connection we note that the defendant has filed a pleading styled as a cross-claim and third-party cross-claim which, apparently, is still pending.

If, upon trial of the action, the trial court finds a breach of contract committed by Midland it should experience no great difficulty in fashioning a decree requiring Midland actively to recruit and employ a qualified minority member to fill the next succeeding vacancy in its office staff. Through this means the two most recent vacancies to have occurred in the staff since the contract was signed will have become filled by members of the majority and minority groups on a one to one basis, a solution which we believe will not offend constitutional or civil rights requirements under attending circumstances.

It is so ordered.

SCHROEDER, J., dissenting: I must respectfully dissent because in my opinion, the subject of civil rights in employment practices has

been preempted at the state level by the Kansas Act Against Discrimination (K. S. A. 44-1001, *et seq.*), thereby precluding cities from entering the field by the enactment of local ordinances under the Home Rule Amendment.

The matters of fair employment practices and civil rights are matters of statewide and not local concern. Chapter 44 of the Kansas Statutes Annotated applies to labor and industries in Kansas and discloses that this state by its legislature has extensively entered the field of labor. Article 1, relates to protection of employees; Article 2, eight hour day on public work; Article 3, payment of wages; Article 4, employment offices, agencies and committees; Article 5, workmen's compensation; Article 5a, occupational diseases; Article 6, regulation of labor and industry; Aricle 7, employment security law; Article 8, employer and employee relations; Article 9, boiler inspection; and Article 10, Kansas Act Against Discrimination.

Cities now receive their authority to legislate from the constitution (Article 12 § 5, Cities' powers of home rule). The home rule power of cities under the constitution was the subject of consideration in *Claflin v. Walsh,* 212 Kan. 1, 509 P. 2d 1130. While the court in its opinion cites *Claflin* and quotes one paragraph, the reader is given the impression that the home rule power of cities is absolute unless the legislature has specifically written language into an enactment which preempts the field, thereby precluding action on the part of a city. This is not a proper construction of the opinion in *Claflin.*

In *Claflin* the court said:

"The home rule power of cities is not absolute. It is subject to the power of the legislature to act in certain areas—exclusively in some, optionally in others. These limitations on city power are expressly set forth in the home rule amendment. Section 5 (*a*) of the constitutional provision cited in full above vests absolute and exclusive power in the legislature in regard to the procedure for incorporating cities, the methods of altering boundaries, the methods by which cities may be merged or consolidated, and the methods by which cities may be dissolved. Statutory enactments in these areas are not subject to the exercise of home rule power by charter ordinance.

"The optional powers of the legislature are set forth in Section 5 (*b*) *as limitations or exceptions to the exercise of home rule power by cities. The home rule power is subject to optional control by legislative action in four specific areas:*

"(1) *Enactments of statewide concern which are applicable uniformly to all cities.*

"(2) Other enactments of the legislature applicable uniformly to all cities.

"(3) Enactments applicable uniformly to all cities of the same class

limiting or prohibiting the levying of any tax, excise, fee, charge or other exaction.

"(4) Enactments of the legislature prescribing limits of indebtedness." (p. 7.) (Emphasis added.)

The court, after discussing Section 5 (*d*) of Article 12 requiring a liberal construction of the powers and authority granted cities for the purpose of giving to cities the largest measure of self-government (quoted by the court in its opinion), went on to review cases where the legislative intention was made clear and unequivocal. The court then said:

"*The difficulty is that in many statutes the legislative intention to have uniformity throughout the state is not expressly stated. In that situation courts are required to glean legislative intent by applying established rules of statutory construction.* In order to ascertain the legislative intent, courts are not permitted to consider only a certain isolated part or parts of an act but are required to consider and construe together all parts thereof *in pari materia.* When the interpretation of some one section of an act according to the exact and literal import of its words would contravene the manifest purpose of the legislature, the entire act should be construed according to its spirit and reason, disregarding so far as may be necessary the strict letter of the law. (*Gnadt v. Durr,* 208 Kan. 783, 494 P. 2d 1219.) In addition, to be *in pari materia* statutes need not have been enacted at the same time. Statutes relating to the same subject, although enacted at different times, are *in pari materia* and should be construed together. (*Flowers, Administratrix v. Marshall, Administrator,* 208 Kan. 900, 494 P. 2d 1184.)

"These rules of construction require us to consider all statutes relating to the same subject together in determining legislative intent. We should follow these rules in determining whether the legislature intended to have a statute applied 'uniformly to all cities.'" (p. 8.) (Emphasis added.)

On the authority of *Claflin* then we must look to the Kansas Act Against Discrimination to ascertain whether the legislature intended to preempt the field.

The ordinance of the City of Hutchinson here in question is an ordinary ordinance to provide a "civil rights commission" and legislate upon employment practices within the city. Even by charter ordinance the city could not set aside the State's Civil Rights Laws and pass such a charter ordinance. The Kansas Act Against Discrimination (K. S. A. 1972 Supp. 44-1001) describes reprehensible conduct in employment relations in these words:

". . . This act shall be known as the Kansas act against distrimination. *It shall be deemed an exercise of the police power of the state for the protection of the public welfare, safety, health and peace of the people of this state.* The practice or policy of discrimination against individuals in employment relations, in relation to free and public accommodations or in housing by

reason of race, religion, color, sex, national origin or ancestry *is a matter of concern to the state,* since such discrimination threatens not only the rights and privileges of the inhabitants of the state of Kansas but menaces the institutions and foundations of a free democratic state. *It is hereby declared to be the policy of the state of Kansas to eliminate and prevent discrimination in all employment relations,* to eliminate and prevent discrimination, segregation, or separation in all places of public accommodations covered by this act, and to eliminate and prevent discrimination, segregation or separation in housing.

"*It is also declared, to be the policy of this state to assure equal opportunities and encouragement to every citizen regardless of race, religion, color, sex, national origin or ancestry, in securing and holding, without discrimination, employment in any field of work or labor for which he is properly qualfied,* to assure equal opportunties to all persons within this state to full and equal public accommodations, and to assure equal opportunities in housing without distinction on account of race, religion, color, sex, national origin or ancestry. It is further declared that the opportunity to secure and to hold employment, the opportunity for full and equal public accommodations as covered by this act and the opportunity for full and equal housing *are civil rights of every citizen.*

"*To protect these rights, it is hereby declared to be the purpose of this act to establish and to provide a state commission having power to eliminate and prevent segregation and discrimination, or separation in employment,* in all places of public accommodations covered by this act, and in housing because of race, religion, color, sex, national origin or ancestry, either by employers, labor organizations, employment agencies, realtors, financial institutions or other persons as hereinafter provided." (Emphasis added.)

Under the provisions of K. S. A. 1972 Supp. 44-1004, the Kansas Act Against Discrimination creates *the commission on civil rights and grants statewide*:

". . . [F]unctions, powers and duties:

"(1) To establish and maintain its principal office in the city of Topeka, *and such other offices elsewhere within the state as it may deem necessary.*

"(2) *To meet and function at any place within the state.*

"(3) To adopt, promulgate, amend and rescind suitable rules and regulations to carry out the provisions of this act, and the policies and practices of the commission in connection therewith.

"(4) *To receive, initiate, investigate, and pass upon complaints alleging discrimination in employment, public accommodations and housing because of race, religion, color, sex, national origin or ancestry.*

"(5) *To subpoena witnesses, compel their appearance, require the production for examination of records, documents and other evidence or possible sources of evidence* . . .

"(6) To include any term in a conciliation agreement as could be included in a final order under this act.

"(7) To apply to the district court of the county where the respondent resides or transacts business for enforcement of any conciliation agreement by seeking specific performance of such agreement.

"(8) *To issue such final orders after a public hearing as may remedy any existing situation found to violate this act and prevent its recurrence.*

\* \* \* \* \*

"(10) *To create such advisory agencies and conciliation councils, local, regional, or statewide, as in its judgment will aid in effectuating the purpose of this act,* to study the problem of discrimination in all or specific fields or instances of discrimination because of race, religion, color, sex, national origin or ancestry; to foster, through community effort or otherwise, good will, co-operation and conciliation among the groups and elements of the population of this state, and to make recommendations to the commission for the development of policies and procedures, and for programs of formal and informal education, which the commission may recommend to the appropriate state agency. *Such advisory agencies and conciliation counils shall be composed of representative citizens serving without pay.* The commission may itself make the studies and perform the acts authorized by this paragraph. It may, by voluntary conferences with parties in interest, endeavor by conciliation and persuasion to eliminate discrimination in all the stated fields and to foster good will and cooperation among all elements of the population of the state." (Emphasis added.)

From the foregoing it is apparent the state commission has *the duty* to create such *advisory agencies and conciliation councils at the local levels of our government* as in its judgment will aid in effectuating the purposes of the act. Therefore if a local agency at Hutchinson in the judgment of the state commission would aid in effectuating the purposes of the act (heretofore set out), *it would have the duty to create such agency in the City of Hutchinson, as an arm of the state commission, to serve as an advisory agency and conciliation council.*

The act supplementing the Kansas Act Against Discrimination (Laws of 1970, Chapter 193) concerning "discriminatory housing practices" refers to city ordinances that protect fair housing, and it permits the commission on civil rights *to cooperate with local fair housing agencies.* These sections now appear as K. S. A. 1972 Supp. 44-1024 and 44-1025. Nothing appears, however, in the Kansas Act Against Discrimination as it applies to discrimination in employment practices (K. S. A. 1972 Supp. 44-1001 to K. S. A. 1972 Supp. 44-1013) about cooperation with local "fair employment agencies." Had the legislature thought it advisable, it would have included references to "local fair employment agencies" but instead the legislature chose the language in 44-1004 (10), *supra, to create local advisory agencies in fair employment matters.* The legislature thereby retained for the Kansas Commission on Civil

Rights exclusive statewide jurisdiction issues of discrimination in employment relations, even at the local level.

Under the doctrine of "express mention and implied exclusion" a rational interpretation of the Kansas Act Against Discrimination gives statewide uniformity to the protection of fair employment practices. In *LeSueur v. LeSueur,* 197 Kan. 495, 419 P. 2d 817 the court said:

". . . The direct mention of this discretionary authority implies exclusion of any other implied authority. The general rule is thus stated in 82 C. J. S., Statutes, § 333a, p. 668:

" 'Under the general rule of express mention and implied exclusion, the express mention of one matter excludes other similar matters not mentioned; every positive direction in a statute contains an implication against everything contrary to it; the specification of one particular class excludes all other classes; *and an affirmative description of powers granted implies a denial of nondescribed powers.* . . .' " (p. 500.)

Liquor cases upon which the court relies in its opinion are no help because the problems are not uniform throughout the state. The makeup of the population, the proximity to military establishments, even the size of a community may pose special liquor problems.

Employment relations applicable to the civil rights of a communities' citizens remain fairly constant. The problems are the same for Hutchinson, Wichita, Topeka, Kansas City and other cities in Kansas. This sameness and the need for uniformity of decision and interpretation throughout the state results from the United States Constituion and congressional directives which spell out the basic precepts for universal fair play and equality in employment. 42 U. S. C. § 2000e-8 (*b*) (1964) provides for co-operation between federal and state agencies.

The Kansas Act Against Discrimination expresses the policy of the state "to eliminate and prevent discrimination in all employment relations" (K. S. A. 1972 Supp. 44-1001) and "to assure equal opportunities and encouragement to every citizen regardless of race, religion, color, sex, national origin or ancestry, in securing and holding, without discrimination, employment in any field of work or labor for which he is properly qualified." To accomplish the purposes of the act it provides "a state commission having power to eliminate and prevent segregation and discrimination, or separation in employment." The Kansas Act Against Discrimination extends the constitutionally protected rights to fair play and equality

in employment uniformly to every part of the state. In employment relations the Kansas act occupies the entire field to the exclusion of the ordinance.

To determine whether a conflict exists one must identify and evaluate such policy considerations as the need for statewide uniformity, the strength of the municipal interest in autonomy, and the extent of any interference which the ordinance causes in the enforcement of the state legislative enactment.

The employment security division, administering the Kansas Employment Security Law (K. S. A. 44-701 *et seq.*) under federal and state direction, would be required to comply with different interpretations in job situations in each local office area. Such a municipal civil rights ordinance, as we have here, would be a hindrance and would interfere with the enforcement of the statute. In this connection see the factual situation presented in *City of Hutchinson v. Hutchinson, Office of State Employment Service*, 213 Kan. 399, 517 P. 2d 117. There, except for the fact that the wrong parties were sued, the Hutchinson Human Relations Commission acting through the city seeks to bring the Kansas State Employment Service, a state agency, to its knees, a situation in which the tail seeks to wag the dog.

Furthermore, questions of concurrent jurisdiction would make for prolific litigation. The City of Hutchinson's Human Relations Commission is not equipped to carry local civil rights matters to a final conclusion. The local method of enforcing the ordinance would substantially interfere with state enforcement of the Kansas Act Against Discrimination.

By permitting the Hutchinson ordinance to stand it is given extraterritorial impact, subjecting state and federal governments in employment relations to municipal control. The city ordinance may be said to conflict with the statutory language itself. The city ordinance is also in conflict with the statute because the statute occupies the entire field. The city ordinance is in conflict with the statute because it is not as strict. The city human relations commission may find a civil rights violation, yet it cannot itself correct the violation.

The Supreme Court of the State of Nebraska has held in *Midwest Employers Council, Inc. v. City of Omaha*, 177 Neb. 877, 131 N. W. 2d 609, that matters of fair employment practices and civil rights are matters of statewide and not of local concern.

Senate Bill No. 223 introduced in the 1973 session of the Kansas Legislature is an act relating to civil rights, and, if passed, it would have authorized cities to establish municipal human relations commissions, "prescribing the powers, duties and functions thereof." This bill was not enacted into law by the 1973 session of the legislature. It is apparent from the bill that the legislature does not construe the Kansas Act Against Discrimination as authorizing the establishment by cities of local municipal human relations commissions to administer civil rights in employment relations.

It is noted the attorney general has joined in the brief *amicus curiae* of the Kansas Commission on Civil Rights, The National Association for the Advancement of Colored People, The American G. I. Forum and The Kansas Human Relations Association. All of these have urged the court to uphold the constitutionality of the Hutchinson ordinance. *The State Labor Commissioner,* Darrell D. Carlton, has filed a brief *amicus curiae* urging the court to strike down the Hutchinson ordinance as unconstitutional.

It is respectfully submitted the judgment of the lower court should be affirmed.

FATZER, C. J., joins in the foregoing dissenting opinion.