SPRINT COMMUNICATIONS COMPA-NY, Cable & Wireless Communications Inc., Metromedia Communications Corporation nee CSI nee ITT, MetroCom nee TMC, RealCom Office Communications, Inc. nee Contel, ALLNET Communication Services, Inc., Mid–Atlantic Telecom, Inc., Long Distance Service of Washington, Inc., Appellants,

v.

Sharon Pratt KELLY, Sharon Morrow, & District of Columbia, Appellees.

SPRINT COMMUNICATIONS COMPA-NY, Cable & Wireless Communications, Inc., Metromedia Communications Corporation, Contel Office Communications, Inc., ALLNET Communication Services, Inc., Long Distance Service of Washington, Inc., Appellants,

v.

Sharon Pratt KELLY, Sharon Morrow, & District of Columbia, Appellees.

ALLNET COMMUNICATION
SERVICES, INC.,
Appellant,

v.

Sharon Pratt KELLY, Sharon Morrow, & District of Columbia, Appellees.

CABLE & WIRELESS
COMMUNICATIONS,
INC., Appellant,

v.

Sharon Pratt KELLY, Sharon Morrow, & District of Columbia, Appellees.

CONTEL OFFICE COMMUNICATIONS,
INC., Appellant,

v.

Sharon Pratt KELLY, Sharon Morrow, & District of Columbia, Appellees.

AMERICAN TELEPHONE & TELE-GRAPH COMPANY, AT & T Communications of Washington, D.C., Appellants,

v.

DISTRICT OF COLUMBIA, Appellee.

METROMEDIA COMMUNICATIONS
CORPORATION, Appellant,

v.

Sharon Pratt KELLY, Sharon Morrow, & District of Columbia, Appellees.

CABLE & WIRELESS
COMMUNICATIONS,
INC., Appellant,

v.

Sharon Pratt KELLY, Sharon Morrow, & District of Columbia, Appellees.

RICHARD J. RICE, INC., Appellant,

v.

Sharon Pratt KELLY, Sharon Morrow, & District of Columbia, Appellees.

Nos. 91–TX–846, 92–TX–252, 92–TX–288, 92–TX–289, 92–TX–338, 92–TX–373 and 92–TX–576 to 92–TX–578.

District of Columbia Court of Appeals.

Argued Oct. 20, 1993.

Decided March 15, 1994.

Joseph A. Reiser and William Malone, with whom John M. Wood, Mitchell F. Brecher, and Russell M. Blau, Tendler, Facer & Wunsch, were on the brief, for appellants.

Edward E. Schwab, Asst. Corp. Counsel, with whom John Payton, Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, were on the brief, for appellees.

Before ROGERS, Chief Judge, and FERREN and FARRELL, Associate Judges.

## PER CURIAM:

These seven consolidated appeals represent the continuation of litigation by long-distance telephone companies challenging the D.C. Gross Receipts Tax Amendment Act of 1987 (the 1987 Act). *See Barry v. American Tel. & Tel. Co.,* 563 A.2d 1069 (D.C.1989). Appellants here [1] contend that the motions judge erred as a matter of law in granting summary judgment to the District of Columbia. Thus, we are confronted with appellants' contentions that the Council of the District of Columbia lacked the authority to enact the 1987 Act under the Origination Clause of the United States Constitution, and that the 1987 Act violates the Commerce Clause of the Constitution because the limited exemption of long-distance companies from the District's personal property tax, and certain sales and use taxes, discriminates

1. A joint brief and reply brief were filed, only on behalf of appellants Sprint Communications Co., Cable & Wireless, Metromedia, MetroCom, Real-Com, Mid–Atlantic, ALLNET, AT & T, and Long Distance Service of Washington, Inc. Except in

Appeal No. 92–TX–373, appellees are the Mayor, the Director of the Department of Finance and Revenue, and the District of Columbia: we refer to appellees as the District of Columbia, or the District.

against out-of-District of Columbia carriers. We hold that the Council had the authority to enact the 1987 Act. We further hold, consistent with recent decisions of the United States Supreme Court involving the internal consistency principle, that the limited exemptions in the 1987 Act violate the Commerce Clause. Accordingly, we reverse the grant of summary judgment.[2]

## I.

The background of this tax litigation, which followed AT & T's divestiture of its local operating companies in connection with the antitrust suit in *United States v. American Tel. & Tel. Co.*, 552 F.Supp. 131 (D.D.C. 1982), *aff'd mem.*, 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983), is set forth in *Barry v. American Tel. & Tel. Co.*, *supra*, 563 A.2d at 1070–1073. For our purposes it suffices to state that the Council of the District of Columbia enacted the D.C. Gross Receipts Tax Amendment Act of 1987 in an attempt to recapture revenues that it had to

refund as a result of the divesture of AT & T in January, 1984.[3] The 1987 Act required telecommunications companies previously exempt from the gross receipts tax to pay a 6.7 percent tax on gross receipts received from the sale of toll communications services that originated from or terminated on telecommunications equipment located in the District of Columbia and billed to a District telephone.[4] The 1987 Act also provided for exemptions from the District's personal property tax, and certain sales and use taxes, whenever a company had property in the District of Columbia that produced gross receipts subject to the gross receipts tax.[5] It also provided for a credit against the gross receipts tax for personal property taxes on such property paid to the District of Columbia during the period of retroactivity, July 1, 1986, through September 30, 1987.[6]

Following argument, the motions judge granted the District's motion for summary judgment, issuing a written decision on February 18, 1992.[7] *See Cable & Wireless Com-*

2. In light of our disposition we do not reach appellants' contention that the retroactivity provision of the 1987 Act violates the Due Process Clause, and that the trial court (Judge Sullivan) erred in dismissing their motions to amend their complaint, under Super.Ct.Civ.R. 15, to show prepayment of the tax by Cable & Wireless Communications, Inc.

3. The District government estimated that as of 1986, the exclusion of access charges from taxation as gross receipts under D.C.Code § 47–2507 (Supp.1986), *see District of Columbia v. Chesapeake & Potomac Tel. Co.*, 516 A.2d 181 (D.C. 1986) (gross receipts from access charges are not from sale of public utility commodities and services), resulted in a revenue loss of approximately $23.6 million. *See* REPORT OF THE COUNCIL OF THE DISTRICT OF COLUMBIA COMMITTEE ON FINANCE AND REVENUE ON BILL 7–186, GROSS RECEIPTS TAX AMENDMENT ACT OF 1987, at 7 (June 29, 1987). Under the 1987 Act, the District anticipated recovering about $20 million from the retroactive portion of the tax and collecting approximately $18.5 million annually thereafter. *Id.* at 7–8.

4. D.C.Code § 47–2501(b)(1) (Supp.1989) provides, in part, that all telecommunications companies were required to pay a 6.7 percent tax on the

> monthly gross receipts from the sale of toll telecommunication services that originate from or terminate on telecommunication equipment located in the District and for which a toll charge or periodic charge is billed to an appa-

> ratus, telephone, or account in the District, to a customer location in the District, or to a person residing in the District, without regard to where the bill for the service is physically received.

The tax was self-executing; every month the companies had to file an affidavit with the Mayor setting forth the amount of monthly gross receipts on which payment of the tax was to be made. *Id.* § 47–2501(b)(1)(A).

5. *See* D.C.Code §§ 47–1508(a)(3)(B); –2005(5); –2206(1) (Supp.1989). *See infra* note 18.

6. *See* D.C.Code §§ 47–2501(b)(3)(B), (C); –2005(5); and –2206 (Supp.1989). The 1987 Act was superceded by the D.C. Toll Telecommunications Act of 1989. *See* D.C.Code §§ 47–3901 to 3921, –2005(5), –1508(a)(3)(B), –2501 (Supp. 1990). The 1989 Act added provisions crediting taxes paid to other jurisdictions on long distance calls and facilitating the means of determining data necessary for computing the tax. D.C.Code § 47–3907 (Repl.1989). The 1992 Omnibus Budget Support Act of 1992, 39 D.C.Reg. 4895, D.C.Law 9–145, repealed the personal property tax exemption.

7. The District of Columbia filed a motion to dismiss the litigation that was still subject to the remand and direction to vacate in *Barry v. American Tel. & Tel. Co.*, *supra*, 563 A.2d at 1070, because the carriers had not complied with § 47–3307's "pay first and litigate later" rule. On June 6, 1991, Judge Sullivan granted the

*munications, Inc. v. District of Columbia,* Tax No. 4091–88 (D.C.Super.Ct. Feb. 18, 1992) (Opinion of Judge Doyle). Appellants now contend that the Gross Receipt Tax Amendment Act of 1987 is unconstitutional on three grounds: (1) it was enacted by the Council of the District of Columbia in violation of the Origination Clause of the United States Constitution; (2) it violates appellants' right under the Commerce Clause to be free of discriminatory burdens on out-of-state competitors; and (3) it violated Due Process as a result of its retroactivity provisions in light of the foreclosure to appellants under federal law of recovery of the tax from their customers.[8] We address only the first two contentions.[9] *See Holland v. Hannan,* 456 A.2d 807, 814 (D.C.1983) (standard of review of grant of summary judgment).

## II.

■ Appellants contend that the 1987 Act was unconstitutional because it violated the Origination Clause in two respects: first, be-

cause the District of Columbia Self–Government and Governmental Reorganization Act of 1973, D.C.Code §§ 1–201 *et seq.* (Repl. 1992), originated in the Senate as S. 1435, 93d Cong., 1st Sess (1973), the delegation of taxing authority to the District government did not satisfy the requirement of House of Representatives origination; and second, because the Origination Clause has always been understood to apply to District of Columbia taxes, the 1987 Act is invalid.

The motions judge correctly rejected these arguments. The Origination Clause of the Constitution, art. I, § 7, cl. 1, provides that "[a]ll bills for raising revenue shall originate in the House of Representatives." As Judge Doyle observed in his opinion, the provision derived from the British tradition that money bills must originate in the House of Commons, not the House of Lords.[10] Further, the provision has never prevented delegations of taxing authority to the District of Columbia or to the territorial governments.[11]

District's motion to dismiss. The non-AT & T appellants appealed, but this court postponed consideration of Judge Sullivan's order pending consideration of the cross-motions for summary judgment filed after AT & T's post-tax payment refund suit. Judge Sullivan transferred the consolidated cases to Judge Doyle to consider the cross-motions for summary judgment.

8. Two notices of appeal therefrom were filed, a joint appeal by the non-AT & T appellants on March 6, 1992, and one by the AT & T appellants on March 18, 1992.

9. We address the Origination Clause argument because of our conclusion that the District of Columbia may yet remedy the Commerce Clause defect in the 1987 Act.

10. Opinion of Judge Doyle, *supra,* at 9 n. 7 (citing (actual cite now) 3 THE NEW ENCYCLOPAEDIA BRITANNICA, MICROPAEDIA, *House of Commons,* 43 (1981)).

11. Opinion of Judge Doyle, *supra,* at 10. Thus, from its beginnings, the city of Washington, a municipal corporation, was given the "full power and authority to pass all by-laws and ordinances," and the power "to lay and collect taxes." Act of May 3, 1802, Incorporating the City of Washington, ch. 53, 2 Stat. 195, 197; *see also* Act of May 4, 1812, Amending the Charter of Washington, ch. 75, 2 Stat. 721, 725; Act of July 1, 1812, relative to the Levy Court of Washington County, ch. 117, 2 Stat. 771, 772. Later reorga-

nizations by Congress delegated authority to the District government to enact tax measures. *See* Act of May 15, 1820, Reorganization of the Government of the City of Washington, ch. 104, 3 Stat. 583, 586–588; Act of May 17, 1848, Reorganizing the Government of the City of Washington, ch. 42, 9 Stat. 223–224; Act of Feb. 21, 1871, To Provide a Government for the District of Columbia, ch. 62, 16 Stat. 419, 422–25, 427.

*See also* Act of Mar. 26, 1804, ch. 38, 2 Stat. 283, 284 (splitting Louisiana territory into two territories); Act of Apr. 20, 1836, ch. 54, 5 Stat. 10, 15 (establishing Wisconsin territory); Act of June 12, 1838, ch. 96, 5 Stat. 235, 237 (establishing Iowa territory); Act of Aug. 12, 1848, ch. 177, 9 Stat. 323, 325 (establishing Oregon territory); Act of Mar. 3, 1849, ch. 121, 9 Stat. 403, 405 (establishing Minnesota territory); Act of Sept. 9, 1850, ch. 49, 9 Stat. 446, 449 (establishing New Mexico territory); Act of Sept. 9, 1850, ch. 51, 9 Stat. 453, 454 (establishing Utah territory); Act of Mar. 2, 1853, ch. 90, 10 Stat. 172, 175 (establishing Washington territory); Act of May 30, 1854, ch. 59, 10 Stat. 277, 279 (establishing Nebraska and Kansas territories); Act of Feb. 28, 1861, ch. 59, 12 Stat. 172, 174 (establishing Colorado territory); Act of Mar. 2, 1861, ch. 83, 12 Stat. 209, 211 (establishing Nevada territory); Act of Mar. 2, 1861, ch. 86, 12 Stat. 239, 241 (establishing Dakota territory); Act of Feb. 24, 1863, ch. 56, 12 Stat. 664, 665 (establishing Arizona territory with same powers as New Mexico territory); Act of Mar. 3, 1863, ch. 117, 12 Stat. 808, 810 (establishing Idaho territory); Act of May 26, 1864, ch. 95, 13 Stat. 85, 88 (estab-

Indeed, as the District of Columbia points out in its brief, the delegation of legislative authority under the D.C. Self–Government act, *see* D.C.Code § 1–204, quoted *infra*, is virtually identical to that in the District's Organic Act of 1871, ch. 62, 16 Stat. 419, 423, and substantially like the legislative powers of the territorial governments. *See supra* note 11 and *District of Columbia v. John R. Thompson Co.*, 346 U.S. 100, 105, 73 S.Ct. 1007, 1010, 97 L.Ed. 1480 (1953) (analogizing the delegation of legislative power under the Act of 1871 to similar grants to territorial governments).

The significance of these delegations, as the District points out, arises from the fact that such delegations to subordinate governments of taxing power predated the Constitution, and their continuance by the First Congress clearly demonstrates that the Origination Clause applies only to tax measures to finance the general government.[12] Thus, the purpose of the Origination Clause, relating to the distribution of power within Congress, was to give to the immediate representatives of the people "the primary role in raising revenue" to finance the general, federal government.[13] *See United States v. Munoz–Flores*, 495 U.S. 385, 394–95, 110 S.Ct. 1964, 1971, 109 L.Ed.2d 384 (1990) (citing

THE FEDERALIST No. 58). Consequently, we agree with the District that the grant to citizens of the District of Columbia, who have no voting representative in Congress, of the power to enact local taxes is fully consistent with the Founding Fathers' intention that there would be self-government for citizens of the seat of government. *See* THE FEDERALIST No. 43, at 282 (James Madison) (Paul L. Ford ed., 1898).

The D.C. Self–Government Act provides that:

> Except as provided in §§ 1–206, 1–233, 47–313, the legislative power of the District shall extend to all rightful subjects of legislation within the District consistent with the Constitution of the United States and the provisions of this Act subject to all the restrictions and limitations imposed upon the states by the 10th section of the 1st article of the Constitution of the United States.

D.C.Code § 1–204 (Repl.1992). The chairman of the Senate District Committee, who was also the manager of the bill in the Senate, explained that by this legislation it was intended, with exceptions for taxation of federal property and enactment of an income

---

**12.** *See* Ordinance for the Government of the Territory of the United States north-west of the river Ohio, Art. IV (July 13, 1787) (Northwest Territory), *reprinted in* Act of August 7, 1789, Ch. 8, 1 Stat. 50, 52 n.(a); Act of August 7, 1789, Ch. 8, 1 Stat. 50 (adapting Northwest Ordinance to present Constitution, but making no change in the power of the territorial government to tax). *See Marsh v. Chambers*, 463 U.S. 783, 790, 103 S.Ct. 3330, 3335, 77 L.Ed.2d 1019 (1983); *Burrows–Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 57, 4 S.Ct. 279, 280, 28 L.Ed. 349 (1884) ("[t]he construction placed upon the Constitution by the [First Congress], by the men who were contemporary with its formation, many of whom were members of the convention which framed it, is of itself entitled to very great weight"); *Cohens v. Virginia*, 19 (6 Wheat.) 264, 418, 5 L.Ed. 257 (1821) ("[g]reat weight has always been attached, and very rightly attached, to contemporaneous exposition"); *Martin v. Hunter's Lessee,* 14 U.S. (1 Wheat.) 304, 352, 4 L.Ed. 97 (1816) (paying

special attention to contemporaneous interpretation of the Constitution).

**13.** The District of Columbia suggests that this was done so as to avoid a chief grievance that led to the American Revolution: taxation without representation. *See* W. BENTON, 1787: DRAFTING OF THE U.S. CONSTITUTION, 741, 781 (1986). This purpose is outlined in THE FEDERALIST No. 58, at 386–87 (Alexander Hamilton) (Paul L. Ford ed., 1898):

> The House of Representatives cannot only refuse, but they alone can propose, the supplies requisite for the support of government. They, in a word, hold the purse—that powerful instrument by which we behold, in the history of the British Constitution, an infant and humble representation of the people gradually enlarging the sphere of its activity and importance, and finally reducing, as far as it seems to have wished, all the overgrown prerogatives of the other branches of the government. This power of the purse may, in fact, be regarded as the most complete and effectual weapon with which any constitution can arm the immediate representatives of the people, for obtaining a redress of every grievance, and for carrying into effect every just and salutary measure.

tax on nonresidents, that the elected Mayor and Council of the District of Columbia "can decide in what way and how much to tax their citizens, can enact local ordinances into law, and can begin to shape their own destiny as should be the right of all American citizens." 119 Cong.Rec. 22947 (1973) (Senator Eagleton).[14]

■ We reject appellants' argument that because the D.C. Self–Government Act provides the source of the local government's taxing authority, that law had to originate in the House of Representatives. The term "revenue bill," for Origination Clause purposes, refers only to bills that " 'levy taxes in the strict sense of the word, and are not bills for other purposes which may incidentally create revenue.' " *United States v. Munoz–Flores, supra,* 495 U.S. at 397, 110 S.Ct. at 1972 (quoting *Twin City Bank v. Nebeker,* 167 U.S. 196, 202, 17 S.Ct. 766, 769, 42 L.Ed. 134 (1897)) (citing 1 J. STORY, COMMENTARIES ON THE CONSTITUTION § 880, pp. 610–11 (3d ed. 1858)). Consequently, "a statute that creates a particular government program and that raises revenues to support that program, as opposed to a statute that raises revenue to support Government generally, is not a 'Bil[l] for raising Revenue' within the meaning of the Origination Clause." *Id.* 495 U.S. at 398, 110 S.Ct. at 1972. In *Twin City Bank v. Nebeker, supra,* 167 U.S. at 202–03, 17 S.Ct. at 769, the Supreme Court determined that the test for whether a particular bill is a revenue bill rests upon the bill's "main purpose." *See United States v. Wilson,* 901 F.2d 1000, 1004 (11th Cir.1990) ("where the purpose of an act is 'to raise revenue to be applied in meeting the expenses or obligations of the government,' the act is a revenue measure subject to the origination clause. Where the main purpose of the act is other than raising revenue, it is not subject to challenge under the origination clause") (quoting *United States v. King,* 891 F.2d 780, 781 (10th Cir.1989)).

The D.C. Self–Government Act is not a "revenue bill" within the meaning of the Origination Clause. Generating revenue for the United States government and its operations was clearly not its "main purpose." Rather, the principal purpose of the Self–Government Act was to provide a measure of self-government for the citizens of the District of Columbia by creating a representative form of local government. *See* S.REP. No. 93–219, 93d Cong., 1st Sess. 1 (1973) ("[t]he purpose of [the Self–Government Act] is to enact a District of Columbia Charter Act and thereby restore to the citizens of the District of Columbia some measure of self-government"); D.C.Code 1–201(a) (Repl. 1992) ("the intent of Congress is to delegate certain legislative powers to the government of the District of Columbia, . . . and, to the greatest extent possible, consistent with the constitutional mandate, relieve Congress of the burden of legislating upon essentially local District matters"). Revenues derived from a tax enacted by the Mayor and D.C. Council pursuant to the authority delegated under the Self–Government Act are not generally available for defraying the expenses and obligations of the United States government in connection with its national responsi-

---

14. As Judge Doyle pointed out in his opinion at 9, this court has rejected a restrictive view of the delegation of legislative authority under the Self–Government Act while preventing any intrusion by the Mayor and Council into specifically forbidden areas. *Compare District of Columbia v. Greater Washington Labor Council,* 442 A.2d 110, 115 (D.C.1982) ("transfer by Congress of certain public employment services from United States Department of Labor to the District government, in the absence of a concurrent transfer of private employment work[ers'] compensation . . . does not reflect a congressional intent to prohibit the local government from legislating with respect to private work[ers'] compensation"; former involved federal statute not applicable exclusively to the District of Columbia while latter did), *cert. denied,* 460 U.S. 1016, 103 S.Ct. 1261, 75 L.Ed.2d 487 (1983), *and McIntosh v. Washington,* 395 A.2d 744, 753 (D.C.1978) (delegated authority extends to all rightful subjects of legislation), *with Bishop v. District of Columbia,* 411 A.2d 997, 998 (D.C.1980) (en banc) (repeal of professional exemption to the unincorporated business tax and imposition of a tax on nonresident unincorporated professionals and personal service business "was impermissible exercise of the District of Columbia Council's authority under § 602(a) of the [Self–Government] Act," which included express prohibition of "imposition of any tax on the whole or any portion of personal income . . . of any individual not a resident of the District," D.C.Code § 1–147(a)(5) (Supp.1978)), *cert. denied,* 446 U.S. 966, 100 S.Ct. 2943, 64 L.Ed.2d 825 (1980).

bilities and activities, but are for use by the government of the District of Columbia in support of the activities of the local government.[15]  *See* D.C.Code § 47–301(a)(1) (Repl. 1990).  Any support of national activities is purely "incidental."  *See United States v. Munoz–Flores, supra,* 495 U.S. at 399, 110 S.Ct. at 1973.[16]  Since the principal purpose of the Self–Government Act was not to raise revenues for the general government, it could not have been enacted in violation of the Origination Clause.  *Id.*

Nor does the 1987 Act, a bill for raising revenue for the District of Columbia, violate the Origination Clause because it did not originate in the House.  A contrary holding would ignore the purpose of the Origination Clause, described above, and the history of delegations of taxing authority to the territorial and local District of Columbia governments.  In *Milliard v. Roberts,* 202 U.S. 429, 26 S.Ct. 674, 50 L.Ed. 1090 (1906), the Supreme Court held that an act of Congress originating in the Senate that taxed District of Columbia land to carry out public improvements in the District was not a "revenue bill" within the meaning of the Origination Clause, but rather the "means to the purposes provided by the act."  *Id.* at 437, 26 S.Ct. at 675.  The act at issue in *Milliard* was clearly a District of Columbia tax to which appellants presumably would argue the Origination Clause applies; but the Supreme Court held otherwise.  Like the statute in *Milliard,* the taxing authority delegated to the District of Columbia is merely the means by which the District government is to carry out its self-governing, not a means to raise revenues for the United States.  The Origination Clause simply does not apply to tax measures enacted pursuant to a delegation by Congress of taxing powers to the District or similar governments to carry out their local government functions.

Appellants maintain in their Reply Brief that whether the 1987 Act violates the Origination Clause "may come down to exactly what taxing authority the Congress intended to delegate to the D.C. Council."  They posit that Congress did not intend to give the District of Columbia "carte blanche" taxing authority under D.C.Code § 1–204, and that the general language of § 1–204 does not apply to a matter, in this case taxing authority, specifically dealt with in another part of the same statute.  Appellants suggest that Congress made known its true intent regarding taxing authority by specifically granting authority over existing real and personal property taxes (§ 47–501), and changes in the rates of taxes previously enacted by Congress (§ 47–504) in other provisions of the Self–Government Act, now codified in Title 47 (Taxation and Fiscal Affairs).  We disagree.

First, because § 1–204 was enacted in connection with a fundamental reorganization of the District government and is a broad delegation of legislative authority occurring after the enactment of § 47–501 and § 47–504, the general language of the Self–Government Act controls the language of legislation that preceded it.  The limitations on the District government's taxing authority under the Self–Government Act are expressly stated in the Self–Government Act.  *See* 1 D.C.Code at 226–27 (Repl.1991) (§ 602 of the Self–Government Act, codified as D.C.Code § 1–233); *cf. McIntosh v. Washington, supra* note 14, 395 A.2d at 754 (if Congress had intended to limit the broad grant of legisla-

**15.**  Generally, in states that have such provisions in their state constitutions, laws delegating authority to local government units to levy and collect taxes for local purposes are not considered bills for "raising revenue" within the meaning of the Origination Clause.  *See* F.G. Madara, Annotation, *Application of Constitutional Requirement That Bills for Raising Revenue Originate in Lower House,* 4 A.L.R.2d 973, 984–86 (1949) (citing *Rankin v. Henderson,* 7 S.W. 174 (1888)).

**16.**  Appellants rely on the statement in *Skinner v. Mid–America Pipeline Co.,* 490 U.S. 212, 221, 109 S.Ct. 1726, 1732, 104 L.Ed.2d 250 (1989), that

"the Origination Clause ... implies nothing about the scope of Congress' power to delegate discretionary authority under its taxing power *once a tax bill has been properly enacted* " (emphasis added).  But *Skinner,* which merely applied the familiar standard for congressional delegation of authority to an administrative agency, has nothing to say about the authority of Congress, consistent with the Constitution, to delegate broad governmental authority—including the power to tax for local purposes—to territorial and other subordinate entities such as the District of Columbia government.

tive authority under the Self–Government Act, it would have so stated in the statute or legislative history).[17] The provisions of § 47–501 and § 47–504 were simply modified by the codifiers following the enactment of the Self–Government Act, to refer to the new, elected Council of the District of Columbia. *See* D.C.Code §§ 47–501 (codifier's notation "Change in government"); –504 (same). On their face, § 47–501 and § 47–504 do not preclude any other taxation by the District of Columbia.

Second, volume 10 of the D.C.Code (Repl. 1990) lists the provisions of the D.C. Self–Government Act codified in Title 47 of the D.C.Code. A review of those provisions indicates that they pertain to the District's budget process, the general fund, the issuance of general obligation bonds and revenue bonds, borrowing, and audits by the General Accounting Office. These provisions place no limitation on the District's taxing authority under the Self–Government Act. In addition, § 47–501 and § 47–504, mentioned specifically by appellants, chronologically preceded enactment of the Self–Government Act and therefore cannot be read as having any effect on the delegation of legislative authority under D.C.Code § 1–204.

Third, to adopt appellants' argument would contradict the statutory scheme of the Self–Government Act, premised in part on the requirement that the District government present a balanced budget to Congress, supported by necessary revenue measures. *See*

1 D.C.Code § 442(a)(1) at 202–203 (Repl. 1991), codified as D.C.Code § 47–301(a)(1).

Therefore, appellants' challenges to the delegation of taxing authority by the Self–Government Act and to the 1987 Act itself as violative of the Origination Clause must fail.

### III.

■ Appellants' primary contention, however, is that the 1987 Act, by combining the gross receipts tax with exemptions and credits against personal property and certain sales and use taxes only when the latter are paid to the District of Columbia, impermissibly discriminates against long-distance telephone carriers not based in the District of Columbia, in violation of the Commerce Clause of the United States Constitution. Under the 1987 Act, a long-distance carrier is exempt from the District of Columbia's personal property tax, and certain sales and use taxes, to the extent that the carrier's property in the District of Columbia is used to produce gross receipts subject to the 1987 Act.[18] When, by contrast, carriers (such as appellants) located outside of the District of Columbia use property to produce revenues subject to the 1987 Act, they receive no offset against the gross receipts tax for personal property, sales, and uses taxes paid to their home jurisdiction.[19]

Appellants contend that the exemptions and credits in the 1987 Act place long distance telephone companies located outside

**17.** Thus, appellants' reliance on *Fourco Glass Co. v. Transmirra Prod. Corp.*, 353 U.S. 222, 228–29, 77 S.Ct. 787, 792, 1 L.Ed.2d 786 (1957), is misplaced because in that case, unlike the fundamental governmental restructuring and broad delegation of authority under the Self–Government Act, the Court's conclusion about the statute regarding venue for patent infringement claims rested on the absence of a substantive change in the statute at issue and of an alteration to the scope and purpose of the enactment of the statute. 353 U.S. at 225, 227, 77 S.Ct. at 789, 791.

**18.** The 1987 Act provides exemptions for the following personal property tax, and sales and use taxes, from the gross receipts tax imposed:

The personal property of any telecommunications company ... used or consumed in furnishing a service if the receipts from furnishing the service are subject to a gross receipts tax in

force in the District.... D.C.Code § 47–1508(a)(3)(B) (Supp.1989);

Sales of property purchased by a telecommunication company ... for use or consumption in furnishing a service or commodity if the receipts from furnishing the service or commodity are subject to a gross receipt tax or mileage tax in force in the District.... D.C.Code § 47–2005(5) (Supp.1989);

Sales upon which taxes are properly collected under the [District of Columbia Gross Sales Tax provisions].... D.C.Code § 47–2206(1) (Supp.1989).

**19.** Similarly, to the extent that a long distance carrier located in the District of Columbia uses its property located here to produce revenues outside of the District of Columbia (hence not subject to the District's gross receipts tax), it receives no exemption from other District of Columbia taxes.

the District at a substantial commercial disadvantage. In their view the tax scheme in the 1987 Act is unconstitutional because "the Commerce Clause prohibits a State from imposing a heavier tax burden on out-of-state businesses that compete in an interstate market than it imposes on its own residents who also engage in commerce among States." *American Trucking Ass'ns v. Scheiner*, 483 U.S. 266, 282, 107 S.Ct. 2829, 2839, 97 L.Ed.2d 226 (1987). We are compelled to agree.

■ The Commerce Clause, art. I, § 8, cl. 3, authorizes Congress to "regulate Commerce ... among the several States." Although it is silent about regulation of interstate commerce by States in the absence of Congressional legislation, the Supreme Court has read the Clause as a limit on state power. *See, e.g., Boston Stock Exchange v. State Tax Comm'n*, 429 U.S. 318, 328, 97 S.Ct. 599, 606, 50 L.Ed.2d 514 (1977). To ensure "an area of free trade among the several states," the Supreme Court has held that "[n]o State, consistent with the Commerce Clause, may 'impose a tax which discriminates against interstate commerce ... by providing a direct commercial advantage to local business.'" *Id.* at 329, 97 S.Ct. at 607 (citations omitted). When a state tax is challenged as constituting a violation of the Commerce Clause, the test employed by the Supreme Court is whether the tax: (1) applies to an activity with a substantial nexus to the taxing state; (2) is fairly apportioned; (3) discriminates against interstate commerce; and (4) is fairly related to services or benefits provided by the states. *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 279, 97 S.Ct. 1076, 1079, 51 L.Ed.2d 326 (1977); *see Quill Corp. v. North Dakota*, —— U.S. ——, ——, 112 S.Ct. 1904, 1912, 119 L.Ed.2d 91 (1992); *Goldberg v. Sweet*, 488 U.S. 252, 259–60, 109 S.Ct. 582, 588, 102 L.Ed.2d 607 (1989). Only the third prong is at issue in this case.[20]

■ Under the anti-discrimination component of the *Complete Auto, supra*, test, a tax discriminates against interstate commerce if it is "facially discriminatory, has a discriminatory intent, or has the effect of unduly burdening interstate commerce." *Amerada Hess Corp. v. Director, Div. of Taxation*, 490 U.S. 66, 75, 109 S.Ct. 1617, 1623, 104 L.Ed.2d 58 (1989). Appellants contend that the taxing and exemption provisions of the 1987 Act, in combination, facially discriminate against carriers located outside the District which generate revenues here, contrary to the requirement of "internal consistency" as applied in *Armco, Inc. v. Hardesty*, 467 U.S. 638, 104 S.Ct. 2620, 81 L.Ed.2d 540 (1984), and *Tyler Pipe Indus., Inc. v. Washington Dep't of Revenue*, 483 U.S. 232, 107 S.Ct. 2810, 97 L.Ed.2d 199 (1987).

The internal consistency principle was originally applied by the Supreme Court in fair apportionment cases under the Commerce Clause.[21] "The first ... component of fairness in an apportionment formula is what might be called internal consistency—that is, the formula must be such that, if applied by every jurisdiction, it would result in no more than all of the unitary business income being taxed." *Container Corp., supra* note 21, 463 U.S. at 169, 103 S.Ct. at 2942. In *Armco*, however, the Court for the first time extended the principle to a case involving a claim of facial discrimination against interstate commerce. The Court invalidated a West Virginia gross receipts tax which "[o]n its face ... appear[ed] to" tax a transaction or incident "more heavily when it crosses state lines than when it occurs entirely within the state." 467 U.S. at 642, 104 S.Ct. at 2622. Specifically, West Virginia's gross receipts tax exempted from its reach receipts from the sale of products manufactured in the State but not otherwise. The State argued that exempting resident manufacturers was necessary to compensate for the fact that they were subject to a manufacturing tax

---

20. Appellants do not challenge the 1987 Act under the first, second, and fourth prongs of the *Complete Auto Transit, Inc. v. Brady, supra,* test. *See Goldberg v. Sweet, supra,* 488 U.S. at 267–268, 109 S.Ct. at 592 (holding that Illinois excise tax satisfied the *Complete Auto* test).

21. Apportionment analysis requires that once a certain set of activities is determined to constitute a "unitary business," a state must fairly apportion the income of the business within and outside of the state. *Container Corp. of Am. v. Franchise Tax Bd.,* 463 U.S. 159, 169, 103 S.Ct. 2933, 2942, 77 L.Ed.2d 545 (1983).

West Virginia also imposed, which was inapplicable to out-of-state manufacturers. In rejecting this argument, the Court carried over to the facial discrimination context the test of *Container Corp., supra* note 21, that a tax " 'must be such that, if applied by every jurisdiction,' there would be no impermissible interference with free trade." *Id.* at 644, 104 S.Ct. at 2623.[22] The forbidden discrimination in *Armco* was revealed by the fact that "[i]f Ohio [where Armco was located] or any of the other 48 States imposes a like tax on its manufacturers—which they have every right to do—then Armco and others from out of State will pay both a manufacturing tax and a wholesale tax while sellers resident in West Virginia will pay only the manufacturing tax." *Id.* It was irrelevant to the Court whether another state *in fact* "imposes a manufacturing tax that results in a total burden higher than that imposed on Armco's competitors in West Virginia," *id.,* for otherwise "the validity of the taxes imposed on each taxpayer would depend on the [tax schemes of the] particular other States in which it operated." *Id.* at 645, 104 S.Ct. at 2624 (footnote omitted).

The District's 1987 Act, unlike the tax in *Armco,* does not exempt local carriers from the gross receipts tax, but the distinction is immaterial as the Supreme Court soon made clear in *Tyler Pipe.* Originally the State of Washington had imposed a business and occupation (or B & O) tax upon (*inter alia*) wholesale sales within the State, but exempted from this tax persons subject to other forms of the B & O tax such as a manufacturing tax on products made within the State. Anticipating the *Armco* decision, the Supreme Court of Washington invalidated the ·tax on Commerce Clause grounds.[23] *See Tyler Pipe Indus., Inc., supra,* 483 U.S. at 235–

36, 107 S.Ct. at 2814. The State then legislatively "turn[ed] the B & O tax exemption scheme inside out" by "remov[ing] the wholesale tax exemption for local manufacturers and replac[ing] it with an exemption from the manufacturing tax for the portion of the manufacturers' output that is subject to the wholesale tax." *Id.* at 236, 107 S.Ct. at 2814 (footnote omitted). This scheme resembles the District's 1987 Act which, while exempting no one from the gross receipts tax on covered toll communications services, provides an exemption from personal property (and other) taxes for District property which generates long-distance receipts subject to the gross-receipts tax.

The Supreme Court in *Tyler Pipe* struck down the State of Washington's new tax exemption as well, finding it "the practical equivalent of the exemption" previously invalidated by the state Supreme Court (and invalid by implication under *Armco* ). *Id.* at 241, 107 S.Ct. at 2816.

> A person subject to Washington's wholesale tax for an item is not subject to the State's manufacturing tax for the same item. This statutory exemption for manufacturers that sell their products within the State has the same facially discriminatory consequences as the West Virginia exemption we invalidated in *Armco.*

*Id.* at 240, 107 S.Ct. at 2816. Again the Court applied the requirement of internal consistency, pointing out that Washington's

> multiple activities exemption only operates to impose a unified tax eliminating the risk of multiple taxation when the acts of manufacturing and wholesaling are both carried out within the State. The exemption excludes *similarly situated manufacturers and wholesalers which conduct one of those activities within Washington and the other activity outside the State.*

statute." *Goldberg v. Sweet, supra,* 488 U.S. at 261, 109 S.Ct. at 589.

---

**22.** As the Court explained in a later decision, "To be internally consistent, a tax must be structured so that if every State were to impose an identical tax, no multiple taxation would result. Thus, the internal consistency test focuses on the text of the challenged statute and hypothesizes a situation where other States have passed an identical

**23.** Indeed, the U.S. Supreme Court in *Armco* took note of the Washington Supreme Court's earlier decision "invalidating a Washington tax

*Id.* at 246–47, 107 S.Ct. at 2819 (emphasis added).[24] The State's exemption scheme therefore discriminated against interstate commerce in that "[t]he current B & O tax exposes manufacturing or selling activity outside the State to a multiple burden from which only the activity of manufacturing instate and selling in-state is exempt." *Id.* at 248, 107 S.Ct. at 2820; *see also American Trucking Ass'ns v. Scheiner, supra,* 483 U.S. at 286–87, 107 S.Ct. at 2842 (under test of internal consistency and "our consistent course of decisions in recent years," Court invalidates Pennsylvania lump-sum axle tax, which "exert[ed] an inexorable hydraulic pressure on interstate [truckers] to ply their trade within the State that enacted the measure rather than 'among the several States' ").

Applying *Armco, Tyler Pipe,* and *Scheiner,* we conclude that the tax scheme in the 1987 Act cannot withstand a Commerce Clause challenge. The District of Columbia argues in vain that the 1987 Act is not discriminatory because all carriers with personal property in the District that produces revenues subject to the gross receipts tax receive the same exemptions. This argument is unavailing. The discriminatory consequences of the 1987 Act arise from the circumstance that, if the same limited exceptions existed in every state, then out-of-state carriers would pay more than in-state carriers whenever the former had property subject to their home state's personal property tax but used to produce out-of-state revenues subject to another state's gross receipts tax. The fact that appellants have not shown that the taxing scheme in other jurisdictions would, in fact, create a greater tax burden for them than companies located in the District of Columbia is irrelevant. *See Armco, Inc. v.*

*Hardesty, supra,* 467 U.S. at 644, 104 S.Ct. at 2623; *American Trucking Ass'ns v. Scheiner, supra,* 483 U.S. at 285, 107 S.Ct. at 2841. Also irrelevant is the fact that appellants (except for one carrier which only leases property in the District of Columbia) have received exemptions from the District's personal property tax under the 1987 Act[25] and have not yet shown that, nevertheless, they have been subjected to heavier taxation because of the taxing schemes in other jurisdictions. *See Armco, Inc. v. Hardesty, supra,* 467 U.S. at 644–45, 104 S.Ct. at 2624.[26] The Commerce Clause discrimination arises because the 1987 Act provides only a limited exemption, or credit, to the extent that the company uses personal property in the District of Columbia to produce those receipts. As appellants hypothesize:

> A company which concentrated its property in one state but provided services in many would pay a gross receipts tax on all of its receipts and a personal property tax (and sales and use taxes) on all but a small portion of its personal property. In contrast, a company which spread its property among the several states in proportion to the revenues derived therefrom—thereby becoming essentially equivalent to a "home operator" in each state—would pay a gross receipts tax but would not pay personal property taxes or sales or use tax *anywhere.*

Under *Tyler Pipe, supra,* 483 U.S. at 242–43, 246–48, 107 S.Ct. at 2817, 2819–20, the District of Columbia may not enact a tax scheme whereby the only company that can fully benefit from the available exemptions is one that sells in the District of Columbia only what it produces there, and does not afford

---

scheme identical to that here." 467 U.S. at 645 n. 8, 104 S.Ct. at 2624 n. 8.

**24.** As Justice Scalia pointed out in dissent, Washington's "exclusion ... can only be deemed *facially* discriminatory if one assumes that every State's taxing scheme is identical to Washington's." 483 U.S. at 254 n. 1, 107 S.Ct. at 2823 n. 1 (Scalia, J., dissenting).

**25.** Judge Doyle found that "[a]ll of the [appellants] except Long Distance Services of Washington, Inc. (which leased capacity) have taken the credit in substantial amounts regarding the taxes

which are the subject of the present suit for refund." Opinion of Judge Doyle, *supra,* at 18.

**26.** Although the District of Columbia argues that its gross receipts tax has historically been considered as in lieu of an ad valorem personal property tax, it does not maintain that the gross receipts tax and limited exemptions under the 1987 Act are valid "compensating taxes"; if it did, that argument would not survive application of the internal consistency principle in any event. *See Armco, Inc. v. Hardesty, supra,* 467 U.S. at 642–43, 104 S.Ct. at 2623, and *Tyler Pipe Indus., Inc., supra,* 483 U.S. at 242–43, 107 S.Ct. at 2817.

the same benefits to a company outside of the District that sells within it or indeed to a District company that sells outside it. What is missing in the 1987 Act is "a credit to any taxpayer upon proof that the taxpayer has paid a tax in another State on the same [tax base] which triggered the [gross receipts tax under the 1987 Act]." *Goldberg v. Sweet, supra,* 488 U.S. at 256, 109 S.Ct. at 586; *see Tyler Pipe Indus., Inc., supra,* 483 U.S. at 249, 107 S.Ct. at 2821.

By fully endorsing Justice Goldberg's dissenting opinion in *General Motors Corp. v. Washington, supra,* 377 U.S. at 451–62, 84 S.Ct. at 1573–79 the Supreme Court has apparently signaled in *Tyler Pipe* its preference for a method of taxation that eliminates all overlapping taxation, in favor of the "'federal free market trade unit.'" *General Motors Corp. v. Washington, supra,* 377 U.S. at 461, 84 S.Ct. at 1578 (quoting *H.P. Hood & Sons, Inc. v. Du Mond,* 336 U.S. 525, 538, 69 S.Ct. 657, 665, 93 L.Ed. 865 (1949)).[27] On the other hand, the Court is not unanimous about the validity of the restrictive internal consistency principle of *Armco* and its proge-

ny. Some members of the Court have suggested reasons to reexamine the Court's extension of the principle at least to state tax schemes that are not discriminatory on their face as in *Armco.*[28] In any event, the shifting ground is particularly unfortunate for the District of Columbia, which enacted the 1987 Act in response to an upheaval in the telecommunications industry at a time when the internal consistency principle appeared limited to apportionment cases and facially discriminatory tax schemes such as those involved in *Armco,* so that the 1987 Act could reasonably have been held not to discriminate unfairly against interstate commerce. Moreover, this court is not in a position, as was the Supreme Court of the State of Washington upon having its tax scheme overturned in *Tyler Pipe Indus., Inc., supra,* to hold that the invalidation of the tax would be prospective only;[29] the Supreme Court has repudiated such civil prospectivity. *See Harper v. Virginia Dep't of Taxation,* ── U.S. ──, ──, 113 S.Ct. 2510, 2517, 125 L.Ed.2d 74 (1993) (rejecting any view of retroactivity

**27.** Justice Goldberg endorsed the statement of Justice Jackson in *H.P. Hood & Sons, Inc. v. Du Mond, supra,* 336 U.S. at 538, 69 S.Ct. at 665, that the Commerce Clause was designed "to create a 'federal free trade unit'—a common national market among the States; and the Constitution thereby precludes a state from defending a tax on interstate sales on the ground that the State taxes intrastate sales generally." 377 U.S. at 461, 84 S.Ct. at 1578. Justice Goldberg went on to write that:

> Nondiscrimination alone is no basis for burdening the flow of interstate commerce. The Commerce Clause "does not merely forbid a State to single out interstate commerce for hostile action. A State is also precluded from taking any action which may fairly be deemed to have the effect of impeding the free flow of trade between the States. It is immaterial that local commerce is subjected to a similar encumbrance." *Freeman v. Hewit,* 329 U.S. 249, 252, [67 S.Ct. 274, 276, 91 L.Ed. 265] (1946). A State therefore should not be enabled to put out-of-state producers and merchants at a disadvantage by imposing a tax to "equalize" their costs with those of local businessmen [or businesswomen] who would otherwise suffer a competitive disadvantage because of the State's own taxation scheme. The disadvantage stemming from the wholesale sales tax was created by the State itself and therefore the fact that the State simultaneously imposes the same tax on interstate and intrastate transactions should not obscure the fact that inter-

state commerce is being burdened in order to protect the local market.
> *Id.*

**28.** *See Goldberg v. Sweet, supra,* 488 U.S. at 270, 109 S.Ct. at 593 (Justice O'Connor, concurring in part and concurring in the judgment); *id.* at 271, 109 S.Ct. at 594 (Justice Scalia concurring in the judgment); *Tyler Pipeline Indus., Inc., supra,* 483 U.S. at 253, 107 S.Ct. at 2823 (Justice O'Connor, concurring); *id.* at 254, 107 S.Ct. at 2823 (Justice Scalia, with whom Chief Justice Rehnquist joins, dissenting); *American Trucking Ass'ns v. Scheiner, supra,* 483 U.S. at 198, 107 S.Ct. at 2823 (Justice O'Connor, with whom Chief Justice Rehnquist and Justice Powell join, dissenting); *id.* 483 U.S. at 303, 107 S.Ct. at 2850 (Justice Scalia, with whom Chief Justice Rehnquist joins, dissenting); *Armco, Inc. v. Hardesty, supra,* 467 U.S. at 646, 104 S.Ct. at 2624 (Justice Rehnquist dissenting). *See also* Walter Hellerstein, *"Is 'Internal Consistency' Foolish?: Reflections on an Emerging Commerce Clause Restraint on State Taxation,"* 87 Mich.L.Rev. 138 (1988).

**29.** *See National Can Corp. v. Department of Revenue,* 109 Wash.2d 878, 749 P.2d 1286 (1988) (en banc) (upon applying the three factors of *Chevron Oil Co. v. Huson,* 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971), held that state law did not require refunds and prospective application of *Tyler Pipe Indus., Inc., supra,* was appropriate).

based on a *Chevron Oil* analysis and holding that "full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate our announcement of the rule") (citing *James B. Beam Distilling Co. v. Georgia,* 501 U.S. 529, 541, 111 S.Ct. 2439, 2446, 115 L.Ed.2d 481 (1991) (holding that no court may refuse to apply retroactively a federal rule of law applied to the litigants)).

Consequently, in order to minimize the need to make refunds, *see Dennis v. Higgins,* 498 U.S. 439, 447, 111 S.Ct. 865, 871, 112 L.Ed.2d 969 (1991) (citing *McKesson Corp. v. Division of Alcoholic Beverages,* 496 U.S. 18, 31, 110 S.Ct. 2238, 2247, 110 L.Ed.2d 17 (1990)), the Council of the District of Columbia would have to enact legislation, consistent with Commerce Clause principles, that, for example, would retroactively grant a credit against the gross receipts tax imposed under the 1987 Act for any personal property taxes paid to other jurisdictions on the same tax base, upon proof by the taxpayer of payment of such taxes to another jurisdiction.[30] *See Harper v. Virginia Dep't of Taxation, supra,* —— U.S. at ——, 113 S.Ct. at 2519–20 (dictum). Alternatively, the District government could collect the additional tax from appellants' competitors, or it could do a combination of both. *See McKesson Corp. v. Division of Alcoholic Beverages, supra,* 496 U.S. at 40–41, 110 S.Ct. at 2252.

Accordingly, because the limited exemptions under the 1987 Act impermissibly discriminate against interstate commerce, the 1987 Act is unconstitutional under the Commerce Clause, and we reverse the grant of summary judgment to the District of Columbia. We do not enter judgment for appellants, however, "because federal law does not necessarily entitle them to a refund," and the District of Columbia may "create[ ] in hindsight a nondiscriminatory scheme." *Harper v. Virginia Dep't of Taxation, supra,* —— U.S. at ——, 113 S.Ct. at 2519–20 (dictum) (citing *McKesson Corp. v. Division of Alco-*

*holic Beverages & Tobacco, supra,* 496 U.S. at 40, 110 S.Ct. at 2252).

FARRELL, Associate Judge, concurring:

I join the court's opinion entirely and write only to express my view that the internal consistency principle, as a test for identifying forbidden commerce clause discrimination outside the fair apportionment context, should be reexamined. The reasons are essentially those stated by Justice Scalia in part I of his dissent in *Tyler Pipe.* See particularly 483 U.S. at 257–58, 107 S.Ct. at 2825. As applied here, the internal consistency rule says in effect that, for the District of Columbia constitutionally to adopt the means it has for preventing *double* taxation of local telecommunications carriers, it must provide credits enabling carriers in many instances to escape *any* local taxation based on property located or business conducted in the District. Consider, for example, the carrier having property here that is used to generate telephone charges billable to an address outside the District. Those receipts fall outside the District's telecommunications tax on gross receipts; yet because another state hypothetically might capture them under its similar tax, the District must go further and exempt those receipts from the reach of its personal property or use taxes as well—either that or it must eliminate the exemption relieving locals from paying double taxes (personal property and gross receipts) based on a single transaction. I claim no expertise in commerce clause analysis, but this seems to me unnecessarily formalistic[1] and hard to justify by any generalized fear of balkanization of our nation's tax laws. Before the District must refund the potentially millions of dollars at stake here, it deserves a better explanation than *Tyler Pipe* provides for the invalidity of its tax scheme.

---

30. *See Welch v. Henry,* 305 U.S. 134, 147, 59 S.Ct. 121, 125, 83 L.Ed. 87 (1938) (factors for determining the validity of retroactive taxation). *See also United States v. Hemme,* 476 U.S. 558, 567–71, 106 S.Ct. 2071, 2077–79, 90 L.Ed.2d 538 (1986); *United States v. Durusmont,* 449 U.S. 292, 101 S.Ct. 549, 66 L.Ed.2d 513 (1981).

1. The Court has said, after all, that there is nothing unconstitutional about "fair encouragement of in-state business," *Armco, Inc.,* 467 U.S. at 645, 104 S.Ct. at 2624, of which avoidance of double taxation would seem a prime illustration.