**CITY OF CHARLESTON, Plaintiff,**

v.

**GOVERNMENT EMPLOYEES INSURANCE COMPANY, Defendant.**

**Civ. A. No. 2:93–1666–18.**

United States District Court, D. South Carolina, Charleston Division.

Nov. 29, 1994.

Government Employees Insurance Company (GEICO) asserts that application of the City of Charleston's Business License Ordinance to it in the circumstances under which it conducts business violates the Commerce Clause of the United States Constitution.

## I. FACTUAL BACKGROUND

GEICO is an insurance company with headquarters in Chevy Chase, Maryland, and in Macon, Georgia. GEICO insures risks located in the City of Charleston (City). Specifically, GEICO writes automobile liability insurance, physical damage insurance, comprehensive personal liability insurance, allied and fire lines, and homeowner's and boat owner's insurance on risks located in the City of Charleston.

GEICO transacts all of its sales business and receives premiums outside of South Carolina by the use of interstate mail and telephone. Any advertising done in the City of Charleston is done by the use of interstate publications. GEICO has no office, agent, or business location, nor does it own any real property in the City.

Adjusting and appraising claims is a significant part of GEICO's business. All GEICO claims originating in South Carolina are handled from either the Macon or Chevy Chase office through the mail, by telephone, or by facsimile. Dispatchers from Macon or Chevy Chase fax claims to resident appraisers at their homes for handling. The appraisers appraise the loss, complete the appropriate claims forms, and send the materials back to the Macon or Chevy Chase office. GEICO's appraisers are licensed and regulated by the South Carolina State Insurance Commission.

GEICO currently has two auto damage appraisers in the Charleston area: Mike Hillery, who resides in the City of North Charleston in Dorchester County, and Allen Owen, who lives in Ladson in Berkeley County. Together they share a territory of approximately a 50 to 60 mile radius around the North Charleston area. Hillery comes into the City two or three times a week, while Owen comes into the City two to three times per month. In addition to these trips, Owen, once every two or three months, goes to

Robert G. Clawson, Jr., Timothy A. Domin, Charleston, SC, for plaintiff.

William Jefferson Leath, Jr., Charleston, SC, for defendant.

### ORDER

NORTON, District Judge.

This matter is before the court on Plaintiff's and Defendant's Motions for Summary Judgment. The court held a hearing on these motions on August 9, 1994. Defendant

Crosby's and Jennings' tow yards, which are located in the City. This is typical of the activity which has been conducted by GEICO automobile damage appraisers over the last two or three years.

When appraisers are in the field, they carry a variety of tools to help them do their job. Each uses a company Ford Taurus, a lap top computer, a printer, a set of books called "Mitchell Matics," a camera, a beeper or mobile telephone, and a variety of forms. Each adjuster carries a set of forms which they use when appraising auto damage in the field. Each appraisal lasts from thirty minutes to an hour.

Both appraisers have arrangements with car dealerships in North Charleston where appointments are scheduled one day a week to adjust losses. Owen and Hillery travel in the City if an auto is taken to a tow yard in the City or if a policy holder is unable to get to one of the stationary locations for a scheduled appointment.

GEICO occasionally utilizes the services of independent contractors to appraise claims in the area. These independent contractors are also licensed and regulated by the South Carolina State Insurance Commission. For the last three years, GEICO has used Wilson Appraisers for all overflow adjusting work. Wilson is paid on a per claim fee which is based on the claim being a partial or total loss. The number of claims handled by Wilson for GEICO in the area are as follows: 189 claims in 1991 (estimate); 166 claims in 1992; 71 claims in 1993; and 27 claims as of August 1994. Wilson does not maintain separate records that indicate the number of claims handled within the City limits, nor are there figures available regarding how often a Wilson adjuster travels into the City.

GEICO is licensed, regulated and certified by the State of South Carolina to conduct the business of insurance, specifically, accident & health, property, casualty, surety and marine. GEICO pays taxes on insurance premiums to the State of South Carolina pursuant to Title 38 of the South Carolina Code.

1. By order of this court allowing supplemental pleadings, GEICO's liability for the 1994 tax is

The City provides municipal services to persons and property within the City. These services include fire protection, police protection, animal control, construction permitting and inspection, garbage collection, electrical permitting and inspections, housing code enforcement, rodent control, street maintenance, drainage maintenance, towing company control, traffic control, traffic signaling, and zoning enforcement.

The City of Charleston's Business License Ordinance provides:

> Every person engaged or intending to engage in any calling, business, occupation, or profession listed in the classification index portion of this ordinance, in whole or in part, within the limits of the City of Charleston, South Carolina, is required to pay an annual license fee and obtain a business license in compliance with the terms and conditions of this ordinance.

Business License Ordinance § 1.

Insurance companies doing business within the City are required to apply for a business license on April 1 of each year. Before 1994, this license provided for a business license tax on insurance companies as follows:

6300—Insurance Companies

> On gross premiums collected through offices or agents locations in the city, wherever the risk is located, or collected on policies written on property or risks located within the City, wherever the premiums are collected:
> * * Fire, Casualty, Surety, Title and all others except Life, Health & Accident.... (Declining Rates apply to all gross Premiums in excess of $1,000,000).... 1.29 percent

| B. | Amount (in Millions) Gross Income | Percent of Rates |
|---|---|---|
| | 0–1 | 100 |
| | 1–2 | 70 |
| | 2–3 | 40 |
| | 3–4 | 10 |
| | Over 4 | 5 |

As of 1994,[1] the City's Business License Ordinance requires insurance companies to pay a percentage license fee as follows:

before this Court.

6300—Insurance Companies

On gross premiums collected on policies written on property or risks located in the City, wherever the premiums are collected:

| | |
|---|---|
| Fire, Casualty, except Reinsurance Facility premiums, Surety, Title and all others except Life, Health and Accident | 2.0 percent |
| Reinsurance Facility Premiums | 1.0 percent |

Before 1991, the Business License Ordinance exempted interstate commerce from its taxation scheme. In 1991, the City deleted this exemption. From that date forward, GEICO has not paid the City's assessments. Thus, the City is suing GEICO for back taxes. The fees and penalties sought from GEICO amount to Two Hundred and Seventy Thousand Four Hundred and Sixty Dollars and forty-nine cents ($270,460.49).

GEICO claims the business license tax is unconstitutional because it impermissably restrains interstate commerce. The City claims it is allowed to restrain interstate commerce when regulating the business of insurance. The constitutional question to be answered here is whether the City of Charleston Business License Ordinance violates the Commerce Clause when used to tax interstate insurance business.

## II. ANALYSIS

■ A taxpayer claiming immunity from a tax has the burden of establishing an exemption. *Norton Co. v. Department of Revenue*, 340 U.S. 534, 537, 71 S.Ct. 377, 380, 95 L.Ed. 517 (1951). A validly enacted municipal ordinance, including a business license ordinance, enjoys the same presumption of constitutional validity as any other duly enacted law. *Eli Witt Co. v. West Columbia*, 425 S.E.2d 16 (S.C.1992). "An ordinance is a legislative enactment and is presumed to be constitutional. The burden is upon the taxpayer to prove unconstitutionality beyond a reasonable doubt. The burden requires the attacker to '. . . negate every conceivable basis which might support it.'" *North Charleston Land Corp. v. North Charleston*, 281 S.C. 470, 316 S.E.2d 137 (1984) (*quoting Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 93 S.Ct. 1001, 35 L.Ed.2d 351 (1973)).

The Commerce Clause provides that "Congress shall have Power . . . To regulate Commerce . . . among the several States." U.S. Const. Art. I, § 8, cl. 3. This Clause is a grant of authority to Congress, not an explicit limitation on the power of the states. The Supreme Court has long recognized, however, that the Commerce Clause contains an implied limitation on the power of the states to interfere with or burden interstate commerce. *See Cooley v. Board of Wardens*, 53 U.S. 299, 12 How. 299, 13 L.Ed. 996 (1852). This implied limitation is known as the "dormant Commerce Clause."

■ Despite this implied limitation, Congress may regulate commerce among the states as it sees fit and, in doing so, may "confe[r] upon the States an ability to restrict the flow of interstate commerce that they would not otherwise enjoy." *Lewis v. BT Investment Managers*, 447 U.S. 27, 44, 100 S.Ct. 2009, 2020, 64 L.Ed.2d 702 (1980). If Congress invests in the states the power to regulate an aspect of interstate commerce, any action taken by a state within the scope of the congressional authorization is rendered invulnerable to Commerce Clause challenge. *Western & Southern Life Ins. Co. v. State Bd. of Equalization*, 451 U.S. 648, 653, 101 S.Ct. 2070, 2075, 68 L.Ed.2d 514 (1981); *see also Alleghany Corp. v. Pomeroy*, 898 F.2d 1314, 1320 (8th Cir.1990).

Historically, insurance was not considered "commerce" for Commerce Clause purposes. *See Paul v. Virginia*, 75 U.S. 168, 182–85, 8 Wall. 168, 182–85, 19 L.Ed. 357, 361 (1869) (stating that the issuance of "a policy of insurance is not transaction of commerce.") Based on *Paul*, the "negative implication from the commerce clause was held not to place any limitation upon state power over the [insurance] business." *Prudential Ins. Co. v. Benjamin*, 328 U.S. 408, 414, 66 S.Ct. 1142, 1147, 90 L.Ed. 1342 (1946). For many years, Congress reflected its agreement with the ruling in *Paul* by leaving the regulation of insurance entirely to the states.

In 1944, the Supreme Court abruptly overrode insurance's non-commercial status in *United States v. South–Eastern Underwriters' Ass'n*, 322 U.S. 533, 553, 64 S.Ct. 1162, 1174, 88 L.Ed. 1440 (1944), when it held that

insurance was "commerce" within the meaning of the Commerce Clause. Believing that the business of insurance was "a local matter, to be subject to and regulated by the laws of the several States," H.R.Rep. No. 143, 79th Cong., 1st Sess., 2 (1945), Congress acted quickly in response to *South–Eastern Underwriters* by passing the McCarran–Ferguson Act, 15 U.S.C.A. §§ 1011, 1012 (West 1976), which removed all Commerce Clause limitations on the authority of the states to regulate and tax the business of insurance. *See State Board of Insurance v. Todd Shipyards Corp.*, 370 U.S. 451, 452, 82 S.Ct. 1380, 1381–82, 8 L.Ed.2d 620 (1962). The McCarran–Ferguson Act provides:

> Congress declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States.

> (a) The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.

> (b) No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance: *Provided*, That after June 30, 1948, the Act of July 2, 1890, as amended, known as the Sherman Act, and the Act of October 15, 1914, as amended, known as the Clayton Act, and the Act of September 2, 1914, known as the Federal Trade Commission Act, as amended, shall be applicable to the business of insurance to the extent that such business is not regulated by State law.

The South Carolina legislature responded to the McCarran–Ferguson Act by enacting the Insurance Law of 1947. Codified in Title 38 of the South Carolina Code of Laws, the Insurance Law vests in a Commissioner of Insurance the power and duty of supervising and regulating the transaction of the business of insurance within the state. *State v. National Postal Transport Assoc.*, 234 S.C. 260, 107 S.E.2d 763 (1959). Among other things, the Insurance Law requires licensing of all insurers doing business in the state, including foreign insurance companies. *Id.;* S.C.Code Ann. § 38–5–10 (Law.Co-op.1989).

### A. GEICO'S ARGUMENT

GEICO argues that Congress explicitly specified in the McCarran–Ferguson Act that only *state* taxation and regulation of the "business of insurance" would be exempt from Commerce Clause restraints and that therefore *municipal* taxation is not exempt. GEICO says the United States Supreme Court has repeatedly emphasized that the McCarran–Ferguson Act's grant of exemption from federal regulation is to be narrowly construed. GEICO further argues that Title 38 of the South Carolina Code, which governs insurance, does not grant authority to a municipal corporation to regulate the business of insurance. On the contrary, GEICO says, Section 38–55–10 makes it clear that all insurance contracts are regulated exclusively at the state level. Therefore, GEICO argues, the state of South Carolina has clearly preempted the field of regulating the business of insurance in the state.

GEICO also asserts that there is no case authority enabling municipalities to qualify for Commerce Clause exemption and that to interpret the McCarran–Ferguson Act as granting such authority to a state's municipalities contravenes the express language of the Act and also violates the Supreme Court's mandate to interpret the Act narrowly.

### B. THE CITY'S RESPONSE

The City takes the position that the McCarran–Ferguson Act, in conjunction with later state statutory enactments and case law, exempts it from Commerce Clause requirements. The City advances three arguments in support of its position that the municipality enjoys the same immunity from Commerce Clause restraints as the state enjoys.

### 1. Functional Equivalence of State and Municipality

First, the City argues that South Carolina courts treat municipalities the same as states for purposes of constitutional analysis of local taxation schemes. The City cites *Hibernian Soc. v. Thomas*, 282 S.C. 465, 319 S.E.2d 339 (Ct.App.1984), which states that "[m]unicipal corporations are not independent entities. They are political subdivisions of the state." *Id.* (*citing Hill v. City of Greenville*, 223 S.C. 392, 76 S.E.2d 294 (1953)). The City argues that such equal treatment is consistent with Commerce Clause jurisprudence, which vests with Congress the decision of whether local regulation is appropriate in a given field. The City points out that, in Commerce Clause analysis, there are only two competing sovereigns—federal and local. The founding fathers sought to protect out-of-state businesses engaged in interstate commerce from discrimination by local concerns—regardless of whether the local biases occurred at the state or municipal level. The City thus asserts that it is not useful for Commerce Clause concerns to distinguish between the state and the political subdivisions of the state, and therefore the City enjoys South Carolina's immunity from Commerce Clause restraints in insurance regulation and taxation.

### 2. Home Rule

Second, the City argues that it enjoys the state's freedom from Commerce Clause restraints under the McCarran–Ferguson Act by virtue of an implied delegation of authority. The City says that enactment of the Business License Ordinance is a valid exercise of the "Home Rule" authority conferred upon South Carolina municipalities by constitutional amendment and subsequent statutory enactments. The 1973 "Home Rule" Amendments state:

> The General Assembly shall provide by general law for the structure, organization, powers, duties, functions and the responsibilities of counties, including the power to tax different areas at different rates of taxation related to the nature and level of government services provided....

S.C. Const. art. VIII, § 7.

> The provisions of this Constitution and all laws concerning local government shall be liberally construed in their favor. Powers, duties, and responsibilities granted local government subdivisions by this Constitution and by law shall include those fairly implied and not prohibited by this Constitution.

S.C. Const. art. VIII, § 17.

Subsequent to these amendments, the legislature enacted Section 5–7–30 of the South Carolina Code, which provides, in pertinent part:

> Each municipality of the State ... may enact regulations, resolutions, and ordinances, not inconsistent with the Constitution and general law of this State, including the exercise of powers in relation to roads, streets, markets, law enforcement, health and order in the municipality or respecting any subject which appears to it necessary and proper for the security, general welfare, and convenience of the municipality or for preserving health, peace, order and good government in it, including the authority to levy and collect taxes on real and personal property and as otherwise authorized in this section, make assessments, and establish uniform service charges relating to them; ... levy a business license tax on gross income....

■ The intent of the Legislature in enacting these constitutional and statutory changes was the abolition of "Dillon's rule," a judicial rule presuming municipalities to be without state powers not expressly delegated. *See Williams v. Hilton Head Island*, 429 S.E.2d 802, 804 (S.C.1993). Under "Home Rule," there is a presumption that the state intends to bestow its powers on a municipality so long as the proposed municipal action is "not inconsistent with the Constitution and general law of the state." *Id.* at 805.

In *Williams*, the Supreme Court of South Carolina was called upon to determine the power of a municipality to enact a real property transfer tax. In upholding the munici-

pal tax, the court held that the "Home Rule" enactments gave municipalities "the authority to enact regulations for government services deemed necessary and proper for the security, general welfare and convenience of the municipality or for preserving health, peace, order and good government, *obviating the requirement for further specific statutory authorization....*" *Id.* (emphasis added).

"Home Rule," the City argues, gives the City the same power the state would have to enact a license fee; hence there is no need for specific authorization from the state. Nevertheless, the statutory section giving municipalities the state's power specifically delegates the power "to levy a business license tax." S.C.Code Ann. § 5–7–30. Thus, the City argues that by enacting the specifically authorized business license tax, the City utilizes the state's grant of authority and enjoys the state's protection from Commerce Clause attack.

### 3. Express Recognition of Municipal Taxing of Insurance

Third, the City notes that the South Carolina legislature expressly understood and accepted that municipalities would tax insurance companies through business license ordinances. Section 38–7–160 of the South Carolina Code provides:

> This title may not be construed as preventing any municipality from levying and collecting license fees or taxes in accordance with its ordinances.... Preference must be given hereunder to the municipality wherein the insured property is located, and, if a license is levied against the insuring company on such basis, that company may not be subject to a similar license from a municipality wherein it may collect the premium for such transaction.

S.C.Code Ann. § 38–7–160 (Law.Co-op.1976). According to the City, this explicit recognition of municipal taxing of the insurance business, coupled with the "Home Rule" delegation of general taxing authority, clearly exhibits the propriety of allowing the City to enjoy the insusceptibility to Commerce Clause challenges given "the several States" by the McCarran–Ferguson Act.

### C. GEICO'S REPLY

GEICO argues that, although "Home Rule" grants municipalities broader powers than they previously had, "Home Rule" does not permit municipalities "to escape Commerce Clause requirements by virtue of South Carolina's extremely narrow ceding of authority in its Home Rule Act, an Act which must be construed in a manner consistent and coherent *inter se* with the balance of South Carolina as well as Federal law." (Def.'s Prop.Order at 7.) "Home Rule" clearly does not, and to be consistent with the McCarran–Ferguson Act cannot, grant municipalities any authority to regulate the business of insurance, GEICO argues. Additionally, "Home Rule" does not empower municipalities to deny to insurers (who are already licensed and granted authority to conduct business in South Carolina) the state-granted privilege of doing business in any municipality within the state. (Def.'s Prop.Order at 7.)

GEICO asserts that a review of the Home Rule statute demonstrates a sensitivity on the part of its drafters for tax levies on business concerns not located within a municipality. For certain trades, license tax imposition requires a valid nexus between the tax and the taxpayer's connection with the city. For example,

> a wholesaler delivering goods to retailers in a municipality is not subject to the business license tax unless he maintains within the corporate limits of the municipality a warehouse or mercantile establishment for the distribution of wholesale goods; and a business engaged in making loans secured by real estate is not subject to the business license tax unless it has premises located within the corporate limits of the municipality.

S.C.Code Ann. § 5–7–30. This sensitivity to interstate commerce, GEICO argues, demonstrates the problem with allowing the City to tax an entity with minimal City connections.

### D. THE COURT'S TURN

■ GEICO has previously challenged the application of a South Carolina municipal business license ordinance. In fact, GEICO

was successful in *North Myrtle Beach v. Government Employees Ins. Co.*, 4:90–1031–2 (D.S.C.1991) (unpublished), in which the court refunded to GEICO all taxes it had paid under protest. There, however, North Myrtle Beach's business license ordinance expressly exempted all income derived as a result of interstate commerce. Because GEICO engaged in interstate commerce, it was not liable for taxes under the North Myrtle Beach ordinance.[2] In reaching this conclusion, however, the court expressly noted that states are exempt from the operation of the Commerce Clause when taxing the business of insurance and that, under South Carolina law, municipalities have the authority to levy a business license tax on insurance companies doing business therein. The inference to be drawn from these statements was that the municipality enjoys the state's freedom from Commerce Clause attack. The *North Myrtle Beach* court, however, was not forced to make an explicit statement to that effect and thus did not do so.

This court, on the other hand, faces that precise question and is prepared to so hold. This court agrees with the City's analysis and finds GEICO to be misinterpreting the "Home Rule" enactments as well as the McCarran–Ferguson Act. GEICO's labeling of the shift to "Home Rule" as an "extremely narrow ceding of authority" is hardly justifiable. In fact, the legislature expressly provided that the "powers of a municipality shall be *liberally construed* in favor of the municipality and the specific mention of particular powers shall not be construed as limiting in any manner the general powers of such municipalities." S.C.Code Ann. § 5–7–10 (emphasis added).

Further, such municipal authority does not "contravene the express language of the [McCarran–Ferguson] Act," as GEICO asserts. This court has found no support for GEICO's argument that states have "preempted insurance regulation" such that they cannot delegate their own commerce-burdening taxing authority to their municipalities. Indeed, history suggests that Congress, in allowing states to regulate insurance, considered the potential regulatory bodies to be either the states or the federal government, with no consideration of municipalities. *See Idaho ex rel. Soward v. United States*, 858 F.2d 445, 450 (9th Cir.1988) (McCarran–Ferguson Act was intended "to return the realm of insurance transactions to the status quo" before *South–Eastern Underwriters'*); *SEC v. National Secur., Inc.*, 393 U.S. 453, 459, 89 S.Ct. 564, 568, 21 L.Ed.2d 668 (1969) (McCarran–Ferguson Act "was an attempt to turn back the clock, to assure that the activities of insurance companies in dealing with their policyholders would remain subject to state regulation.") Congress' failure to consider or mention municipalities makes sense, for "municipal governments are but agencies of the superior power of the state ... by which they are constituted, and are invested with only such subordinate powers of local legislation and control as the superior legislature sees fit to confer upon them." *John R. Thompson Co. v. District of Columbia*, 203 F.2d 579, 583 (D.C.Cir.), *rev'd. on other grounds*, 346 U.S. 100, 73 S.Ct. 1007, 97 L.Ed. 1480 (1953).

The McCarran–Ferguson Act differs completely from other federal statutory enactments that have been held to preclude delegation of authority from state to municipality. The Federal Railroad Safety Act (FRSA), for instance, which preempts state law in the entire area of railroad safety except in two narrow situations in which states may regulate, has been held to preclude municipal regulatory ordinances in those two situations. In *Consolidated Rail Corp. v. Smith*, 664 F.Supp. 1228 (N.D.Ind.1987), the court held that municipal ordinances regulating train speeds were preempted by federal law, even though the FRSA allowed a "State ... to adopt ... a law, rule, regulation, order, or standard relating to railroad safety when necessary to eliminate or reduce an essentially local safety hazard." 45 U.S.C. § 434. The court held that "the language of section 434 which permits state regulation

---

**2.** Prior to 1991, the City of Charleston ordinance contained a tax exemption for interstate commerce similar to the exemption in North Myrtle Beach. Not surprisingly and probably as a result of this court's holding in *North Myrtle Beach*, Charleston deleted its interstate commerce exemption in 1991, thereby leading to the different circumstances under which this case arises.

does not permit local regulation." *Consolidated Rail*, 664 F.Supp. at 1237. The court rejected the argument that a state statute impliedly delegated the state's remaining authority under the FRSA to municipalities, saying such an interpretation of the state statute would render it unconstitutional. The court said that "Congress did not intend to permit states to exercise their remaining authority under section 434 by delegating it to municipalities. Such a reading is completely at odds with the language of section 434, the structure of the FRSA as a whole, and Congressional purpose in adopting the statute." *Id.*

The language of the McCarran–Ferguson Act is similar to the language of the FRSA to the extent that it makes no mention of municipalities. However, the structure and the purpose of the McCarran–Ferguson Act, unlike the structure and the purpose of the FRSA, support a state's ability to delegate to municipalities. In disallowing municipal regulation, the court in *Consolidated Rail* relied on the FRSA's elaborate provision for state regulatory agencies to help enforce the FRSA. In the FRSA, Congress defined a role for states to play in its federal scheme. The court also relied on Congress' purpose in enacting the FRSA, which was to enhance railroad safety by making railroad regulation uniform. The court said that if Congress felt the need to preempt virtually the entire field of railroad law so as not to have fifty separate regulatory systems, then Congress surely would not approve of the infinitely greater chaos that would result from "separate regulation by every city, village, township, or hamlet along the mainline." *Id.* at 1238.

The purpose of the McCarran–Ferguson Act, on the other hand, was to restore autonomy to the states in the insurance field. Nothing in the history of the Act, nor its overall structure, is inconsistent with allowing states to delegate taxing authority to municipalities. The legislative history of the Act indicates Congress wanted "to assure a more adequate regulation of this business *in the States* by suspending the application of the Sherman and Clayton Act." H.R.Rep. No. 143, 79th Cong., 1st Sess. 2–3 (emphasis added).

In sum, the states' authority to regulate insurance fairly may be said to encompass the authority to delegate powers that are typically municipal in nature, including certain taxing powers.[3] Such municipal powers would be meaningless if they did not also embrace the state's immunity from Commerce Clause attack. To interpret the Act as clothing only states with the immunity would make no sense, because the power to tax through business license ordinances is peculiarly municipal. *See John R. Thompson*, 203 F.2d at 583.

This court concludes that, in the context of insurance, states may delegate their restriction-free taxing power to municipalities. GEICO's arguments to the contrary are simply not supported by logic or precedent.

### III. CONCLUSION

■ Pursuant to the McCarran–Ferguson Act, the City of Charleston may constitutionally exact a municipal business license fee from GEICO without being subject to Commerce Clause analysis.[4]

It is therefore,

**ORDERED** that the City of Charleston's Motion for Summary Judgment be **GRANTED**; it is further

**ORDERED** that GEICO's Motion for Summary Judgment be **DENIED**; it is further

---

3. See *John R. Thompson Co. v. District of Columbia*, 203 F.2d 579, 583 (D.C.Cir.), *rev'd. on other grounds*, 346 U.S. 100, 73 S.Ct. 1007, 97 L.Ed. 1480 (1953), for a discussion of municipal powers: "[W]hile it is difficult to draw the line ... the preservation of public order, morals and health, the regulation of markets and places of amusement, the inspection of provisions, the improvement and repair of streets, and, as an incident to the others, the levying of general taxes and special assessments [are] appropriate powers of a municipality."

4. Both parties analyzed the City's Business License Fee under the Supreme Court's test in *Complete Auto Transit v. Brady*, 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977), in case this court found Commerce Clause restraints applicable. In light of today's holding, however, this court finds it unnecessary to do so.

**ORDERED** that judgment be entered in favor of the City of Charleston for Two Hundred and Seventy Thousand Four Hundred and Sixty Dollars and forty-nine cents ($270,-460.49).

**AND IT IS SO ORDERED.**